UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| S.B., <br><br> Plaintiff, <br><br> vs. <br><br> KILOLO KIJAKAZI, ACTING COMMISSIONER SOCIAL SECURITY; <br><br> Defendant. | 5:21-CV-05062-VLD <br><br> MEMORANDUM OPINION AND ORDER |

INTRODUCTION

Plaintiff, S.B. seeks judicial review of the Commissioner's final decision denying his application for social security disability benefits under Title II and Title XVI of the Social Security Act.[1]  Mr. B. has filed a complaint and motion to

---

[1]SSI benefits are called "Title XVI" benefits, and SSD/DIB benefits are called "Title II" benefits.  Receipt of both forms of benefits is dependent upon whether the claimant is disabled.  The definition of disability is the same under both Titles.  The difference—greatly simplified—is that a claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are also calculated according to a formula using the claimant's earning history.  There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any.  There are corresponding and usually identical regulations for each type of benefit.  See, e.g., 20 C.F.R. §§ 404.1520 and 416.920 (evaluation of disability using the five-step procedure under Title II and Title XVI).  Mr. B. filed his applications for both Title II and XVI benefits.  His coverage status for SSD benefits expires on December 31, 2020.  AR 24.  In other words, to be entitled to Title II or Title XVI benefits, Mr. B. must prove disability on or before that date.

reverse the Commissioner's final decision denying his disability benefits and to remand the matter to the Social Security Administration for further proceedings.  See Docket Nos. 1, 22.  The Commissioner has filed her own motion seeking affirmance of the agency's decision below.  See Docket No. 23.

This appeal of the Commissioner's final decision denying benefits is properly before the court pursuant to 42 U.S.C. § 405(g).  The parties have consented to this magistrate judge handling this matter pursuant to 28 U.S.C. § 636(c).

## FACTS[2]

### A.    Procedural History

This action arises from S.B.'s application for Social Security Disability Insurance (SSDI) and Supplemental Security Income (SSI).  AR 21.  S.B., born July 17, 1990, (current age 31 years old) applied for Social Security Disability and SSI benefits on April 6, 2020 (SSDI) and August 31, 2020 (SSI).  AR 189-214.  His claim was denied initially and denied on reconsideration.  AR 95, 104.  On January 19, 2021, an administrative hearing was held before Administrative Law Judge ("ALJ") David Willis.  AR 66-94.  Mr. B. was represented by Attorney Brandon Kortgard.  Brandon Kortgard appeared at the hearing with Plaintiff via telephone.  AR 66-69.  Mr. B. and Vocational Expert ("VE") Arrington testified at hearing.  Id.  On June 2, 2021, ALJ Willis issued

---

[2] These facts and corresponding citations are recited from the parties' stipulated statement of facts (Docket No. 19).  The court has made only minor grammatical and stylistic changes.

an unfavorable decision. AR 36-53.  Mr. B. timely requested a review from the

Appeals Council.  AR 16-17.  On July 27, 2021, the Appeals Council denied the

request for review.  AR 1-6.  This appeal followed.

**B.     Material Facts**

      **1.     Psychological and Medical Records**

            **a.     Behavior Management Systems**

On March 31, 2020, Plaintiff saw Brian Mathis, LCSW-PIP, QMHP, at

Behavior Management Systems ("BMS"), Mathis reported: 29-year-old

Caucasian male coming for help.  He shared that he probably could not be

helped.  He cannot hold a job because of his voices and the grim reaper

following him around.  He reported having an eating disorder and problems

with his sister who is abusive to his mom.  He has been experiencing these

severe symptoms since he was 16 years old and could use help.  He would like

to get his mental stability back and his mind organized.  AR 355.

Mathis also reported Mr. B. was somewhat close to his family but doesn't

have close friends.  He reported Mr. B. gets along with people for the most part

and has a good support system.  Id.  Mr. B.'s Father passed away in 2018, and

had PTSD; Mother alive, experiences bi-polar disorder; two sisters: one with bi-

polar disorder and the other with schizoaffective disorder.  AR 356.

For social history, Mathis reported Mr. B. lives in a house with his mom,

finished high school, and went to some college for teaching; Mr. B. denied any

legal issues or substance abuse.  He rarely drinks but when he does, it's to

excess and he hasn't for a few years now.  He has worked in labor and

cleaning.  Id.  He did not have a legal guardian but the counselor at BMS noted that he does have a need for a legal guardian, representative payee, conservatorship, or special needs trust.  Id.  For treatment history, Mr. B. received some counseling when he was 19 years old.  He was seen for counseling and medications.  He took antipsychotics for a while and felt clearer thinking.  Also, Mr. B. talked to a counselor for an eating disorder, purging type.  AR 357.  He reported to formerly drinking alcohol.  Id.

Mathis' general observations were: well-groomed, average eye contact, activity within normal limits, attitude towards examiner was defensive and mistrustful.  AR 358.

As to Mr. B.'s mental status: mood was anxious; affect: constricted; speech: pressured; thought process: tangential loose; hallucination: auditory command visual tactile; thought content: paranoid; delusions: thought broadcasting; cognition: impairment of attention/concentration ability to abstract, erratic/inconsistent memory; intelligence estimate: average; insight: within normal limits; judgment: impaired, ability to make reasonable decisions: moderate.  Id.

The counselor noted that Plaintiff's speech was normal rate low volume and pressured when asked questions.  Id.  Mr. B. wore a beard and mustache. His face was tense, and his eyes appeared to be tired.  His thought content was tangential and derailed at times.  He appeared to be responding to internal stimuli and his answers indicated disorganized thinking.  His answers would become tangential and return to the subject for the majority of the time.  He

4

became blocked certain times, and his answers would then become derailed, jumping from subject to subject.  AR 359.

Mr. B. endorsed thoughts of dying, thoughts of killing himself, had a plan for suicide but did not have any means to carry out his plan and no history of previous suicide attempts.  Id.  His depression questionnaire noted severe depression and a medium risk of suicidal or homicidal risk.  His functional assessment included activities of daily living assessed.  His employment was not clinically indicated until after his symptoms decreased. AR 361.

Mr. B. currently needed assistance in individual care skills, as he was showering once a week but would like to shower more and change his clothes more than once a month.  Id.  He needed help with anger and aggression, as he needed to find ways to de-escalate his way of hitting a wall or pets.  He also needed help with his health, wellness, and his diet.  AR 362.  He had constant headaches and had trouble getting out of bed because his head hurt.  His life goal was to become better and normal.  Id.

Mr. B. presented through self-report and observable behavior indicating schizophrenia.  He shared his first episode of psychosis started when he was 16 years old.  Id.  This included auditory hallucinations that involved two females.  One was mean and the other just there.  He did find it difficult to focus.  His psychosis started to increase to visual hallucinations, delusions of paranoia, and disorganized thinking when he was 19 years old.  He could not hold a job.  After his first episode, he relayed feeling sad and lonely.  He

described symptoms that may have a mood component.  These symptoms significantly interfere with his work, social and familial roles.  Id.

Mr. B. also reported purging and having an eating disorder.  At that time, Counselor Mathis was not able to gather enough information to make a diagnosis and Mr. B. would need to be evaluated during his therapy sessions.  Id.

Counselor Mathis concluded that Mr. B. would continue to decompensate until he ends up homeless, incarcerated, or dead without help from BMS.  Id.  Mr. B. was diagnosed with schizophrenia unspecified, moderate severity, global assessment of function of 30.  Highest global assessment of functioning ("GAF") 30.  AR 363.

On March 27, 2020, Mr. B. saw Peggy O'Connor, CNP, at BMS.  AR 364. He presented with no previous diagnosis and not on any medication.  Id.  Mood went up and down with irritability, energy and concentration comes and goes and he didn't sleep well – from zero to three hours in a 24-hour period.  Id. Mr. B. admitted to suicidal ideation with no plan or intent today.  Id.  He admitted to having bulimia, which was at its worst in his early 20s and he thought it started sometime when he was around 16 years old.  Id.  He denied binge eating anymore, but every time he eats, he vomits.  Id.

He denied suicide attempts in his life, but strong ideation started in his 20s.  He's had bulimia for six years and considered it a form of self-harm. Never married nor in any serious relationship or kids.  He abused alcohol in his early 20s but rarely drinks now.  But when he does drink, it's to excess.

6

AR 364.  He started hearing voices and having visual hallucinations as a teenager and is paranoid.  These symptoms are all worse at night.  Id.

O'Connor reported Mr. B.'s mental Status: Mood: Depressed Anxious Angry; Affect: Full; Speech: clear; Thought Process: Logical; Perception: Within normal limits; Hallucination: Auditory Visual; Thought content: Preoccupations/ruminations Obsessional Depressive Paranoid Self-deprecatory; Delusions: Reference; Cognition: Impairment of: Attention/concentration; Intelligence estimate: Average; Insight: Within normal limits; Judgment: Within normal limits.  AR 366.  O'Connor diagnosed schizophrenia moderate and bulimia nervosa moderate.  With a GAF of 30.  AR 366-367.  O'Connor also prescribed Zyprexa.  AR 367.

On April 24, 2020, Mr. B. saw Peggy O'Connor, CNP, for medication management.  AR 379.  He reported doing better than the last appointment.  His voices were better.  Mood had some depression and anxiety.  Energy, concentration, and sleep were better, and he denied many negative thoughts.  AR 379.  On mental status Nurse O'Connor observed: Mood: Depressed Anxious; Affect: Full; Speech: Clear; Thought process: Slowed thinking; Perception: Within normal limits; Hallucinations: Auditory; Thought content: Preoccupations/ruminations Obsessional Depressive Paranoid Self-deprecatory; Delusions: Reference; Cognition: Impairment of: Attention/concentration; Intelligence estimate: Average; Insight: Partial insight; Judgment: Within normal limits.  AR 380-382.

7

On May 27, 2020, Mr. B. was scheduled to meet with Lynette Roberts, Case Manager, but was unable.  He sent a text message stating that his head hurt and that he is unable to visit at this time and rescheduled for next week. AR 378.

On June 1, 2020, Mr. B. saw Case Manager Lynette Roberts, outside of his home.  Mr. B. appeared calm and stable; he reported medication was helping and he's not hearing voices as much or as loud.  It is during nighttime he suffers the most.  He's been keeping food down as well, although he still purges at times.  He spent some time outside which he hardly ever does because of his symptoms and paranoia.  He was glad to have more medication to help ease his symptoms.  He stated he was trying to get outside more. AR 376, 526.

On June 2, 2020, Mr. B. was scheduled to visit with Counselor Mathis. Counselor Mathis called Mr. B. but he did not answer, and Counselor Mathis left a message.  Mr. B. wrote in an email that he needed to talk on the phone because in Zoom people are watching him.  AR 374.

On June 11, 2020, Mr. B. was scheduled for a visit with his case manager Lynette Roberts.  She noted Mr. B. cancelled his visit for today.  He reported not feeling well, headache, and unable to focus.  AR 372.

On June 16, 2020, Mr. B. was scheduled to meet with Counselor Mathis. Counselor Mathis sent an email to Mr. B. as a reminder of today's meeting a couple of days prior.  Mr. B.'s last email stated he was not comfortable with video conferencing because people are watching him.  AR 373.

8

On June 16, 2020, he was scheduled for a telephone call with Counselor Mathis, but Mr. B. did not answer when he called.  AR 371.

On June 18, 2020, Mr. B. was scheduled to visit with Case Manager Lynette Roberts, but he did not answer the phone.  Mr. B. emailed later to say that he was ok.  Roberts' notes stated that,

> [Mr. B.] has been unable to keep phone or Zoom appointments lately, canceling or not answering.  [H]e will respond by email.  [H]e seems to be struggling a lot with mental issues which stops him from answering calls.  [H]e reported to me that he does not want to do Zoom so we decided to do calls, but he is now not answering calls.

AR 370.

On June 26, 2020, he was scheduled to meet via phone with his Case Manager Lynette Roberts.  Roberts' notes stated, "[Mr. B.] was not available for the scheduled call and he did not return call.  Will email [Mr. B.] to reschedule visit."  AR 369.

On July 9, 2020, Mr. B. had a telephone visit with Case Manager Lynette Roberts.  In her progress note, she explained that due to Corona Virus no face-to-face visits would happen until absolutely necessary or until guidelines are lifted and she will do face-to face with Mr. B. weekly using masks, hand sanitizer and social distance.  AR 524.  She also noted Mr. B. sounded good today; he was doing okay; still hearing voices but tolerable.  Mr. B reported that one of his meds was giving him muscle spasms and he would address it with Peggy, the CNP, when he sees her again.  He reported having a calm 4th of July with his nephew back from the military.  He also reported no stress in the

family at this time.  Mr. B. reported that stress makes his symptoms worse, and he stated that he deals with it by isolating.  AR 525.

On July 23, 2020, he saw Case Manager Lynette Roberts outside of his home.  He appeared to be in fair spirits; reported doing a little better with medication; still isolating and staying inside most of the time; video games help keep his mind off the voices and negative thinking.  He stated he would watch for a phone call from the CNP for a medication check.  AR 520.

On August 6, 2020, Mr. B. saw Case Manager Lynette Roberts at his home.  They sat in the vehicle and visited using masks and hand sanitizer. Mr. B. was in fair spirits.  He was sitting outside on the curb waiting for the case manager.  He reported his symptoms were still there but not as strong. He stated that "it gets worse at night" and that "he misses his father as his father understood his mental illness."  He reported that his sister causes a lot of stress when she comes into the home, and he retreats to his room and isolates.  AR 517.

On August 18, 2020, Mr. B. saw his Counselor, Shauna Smith, MS, LPC, QMHP, NCC at BMS at the office in Hot Springs.  Upon arrival, Mr. B. was cooperative, happy, fully engaged with a good mood and good hygiene.  AR 513. "On a Scale of 1-10, 1=least he has been binging & purging weekly & 10=the most he has been binging & purging weekly.  He would like to find more balance in 6 mo. With a 6 and a 4 in 12 months.  Mr. B. as this time is at a 10."  He reflected on how he had struggled with bulimia for the past 15 years. AR 513.  He said he feels control by doing this.  He would like deeper insight

into his Bulimia nervosa versus just knowing that he does it.  Smith's patient notes discuss that his associative symptoms are present throughout the binge purge cycle.  Disassociations is commonly thought of as an escape from painful experiences.  Mr. B. has struggled he said with bulimia and schizophrenia for the past 15 years since he was 15 years old, and he is now 30 years old.  It appears that Mr. B. has not been able to acknowledge self-soothe and manage this part of his self-experience.  AR 514.

Mr. B. stated he would like to have a deeper understanding of the core of his issues with binging and purging along with getting to the point of being able to talk openly about it and not feel ashamed.  Smith's patient notes state that there may be a sense of control however, it is split with a sense of guilt so the purging to expunge the harm done.  Through this lens which Mr. B. views his behavior, binge/purge behavior and disassociation can be seen as his best effort to attend to a disorganized self-experience.  Smith noted that "focusing the counseling conversation on ways to extinguish and change behavior is important" and Mr. B. needs to learn it is okay to discuss his behavior and not hide it anymore, so that new pathways for healing can emerge.  Mr. B. stated his schizophrenia seemed more balanced when he is medication compliant.  He stated that certain noises like the air conditioner in the window and the loud TV really trigger him.  The counselor discussed going into another room or turning down the television.  Lighting in a room, computer monitors, or televisions are very big and bright these days.  This bothers him but he did not pay attention to the trigger until today, when we discussed it.

11

Mr. B. and the counselor were at the beginning phase of establishing professional rapport and trust.  This is very important to Mr. B. as he copes through trying to be medication compliant, talking with his case manager and now counselor, and considering new ways to approach a 15-year battle with a new perspective on it.  Mr. B. had no suicidal ideations nor homicidal.  Id.

On August 20, 2020, he saw Case Manager Lynette Roberts outside of his home.  He appeared to be in fair spirits; his eyes were clear, and he appeared to be calm and stable.  He reported he made his appointment with CNP Peggy and that he had a good visit with Counselor Shauna Smith.  He reported not getting out of the house as much as he feels anxiety when out and can't wait to get back home.  He stated he broke his toe when he kicked a concrete wall when he was angry.  Mr. B. was able to kind of laugh about what he had done.  AR 511.

On August 25, 2020, he saw Counselor Shauna Smith at the Behavior Management's Hot Springs Office.  AR 505-508.  Mr. B. rated that he was at a 10 on a scale of 1 to 10 for mental health symptoms.  He felt that his mother says things that set him off.  He reported very calmly and politely that he had been hallucinating and hearing voices.  He said it began last Wednesday night at nighttime when it turned dark, the voices amplified, and it felt like something was following him.  He became angry and kicked a brick wall and hurt his foot.  He then fell asleep for a while.  He said that the voices told him to kill himself and he said no.

12

Mr. B. stated his mother was never affectionate when growing up and never really said I love you or that he was a good person.  Mr. B. said that on Saturday the voices became louder, and it was a male voice and very negative. He said the images were different; he said that he had voices first and the hallucinations followed.  He reflected that his mom was retired on a pension from his dad who had been in the military.  Mr. B. said his dad's heart attack in 2018 was difficult.  His mom found his dad and screamed.  Mr. B. said he never received any therapy to help him cope with his father's loss.  On that day, he said he didn't think his medications were working.  He stated he cut back on one and probably shouldn't have.  AR 507.

He was going to see Peggy O'Connor, CNP, on Friday of this week and planned to talk about thoughts pertaining to his medications.  He said he felt like the voices were beating him up and cutting him down and making fun of him.  Purging, he says, felt like death to him.  He stated it felt closer to death, which is what the voices wanted.  To please the voices Mr. B. stated he purged his food.  He used the bathroom sink to purge.  He stated he backs the voices off through purging.

He said that his childhood was difficult; children bullied him for his huge ears and called him dumbo, said that when he was a child he would punch his parents, beat on the floor, be rude to his teachers and students because he never felt good about himself.  He was in trouble all the time at school.  At age 14, he had his ears pinned back to look better.  Mr. B. said he heard voices at the age of 9; images at around 13; and purging began at age 15.  He said he

just thought about the ages and realized it all started earlier than he told anyone before, and he said his mom tried to commit suicide two times that he remembered.  Id.

Mr. B. stated that his mom tried to overdose when he was five and he believes that Dad went into a psychiatric unit over the guilt as he recalls that dad pushed her to do it.  Mr. B. made a connection to his voices and his bulimia today through the discussion of visual imaging and changing negative thoughts, telling the voices to back off, and telling himself he is a good person.  Mr. B. would try to send the images away also.  After the meeting, he stated he had a better understanding about his purging and did not feel embarrassed about his purging now that he has talked about it and understands there is a connection.  Mr. B. was focused, calm, his eyes were bright, his hands were sweating; overall, he was very engaged and pleasant with no suicidal or homicidal ideations.  Id.

On August 27, 2020, Mr. B. saw Case Manager Lynette Roberts outside of his home.  He appeared to be in fair spirits.  He was still hearing voices and reports at times it is a strong voice and other times it is not.  He reported taking his medications regularly, but it doesn't seem to be helping a lot.  Mr. B. shared that his four cats are his company and his entertainment.  He was able to smile a little bit today.  AR 504.

On August 28, 2020, he saw nurse O'Connor for medication management.  AR 529-533.  Mr. B. reported he was doing better but the Zyprexa caused stomach issues and muscle twitches.  His mood was stable

14

with some anxiety; energy and concentration are the same and he's only sleeping about three hours a night; admits to suicidal ideation with no plan or intent.  He continued to struggle with binge eating, bulimia, and headaches. AR 530.  On mental status, O'Connor reported: mood: Depressed Anxious; Affect: Full; Speech: Underproductive; Thought process: Slowed thinking; Perception: Within normal limits; Hallucinations: Auditory; Thought content: Preoccupations/ruminations Obsessional Depressive Self-deprecatory; Delusions: Reference; Cognition: Impairment of: Attention/concentration; Intelligence estimate: Average; Insight: Within normal limits; Judgment: Within normal limits.  Id.

On September 3, 2020, Mr. B. saw Case Manager Lynette Roberts outside of his home.  He appeared to be in fair spirits; reports that he had a visit from the cops as they were delivering an overdue bill from Fingerhut.  It really upset him, but he did not get violent.  Roberts and Mr. B. discussed overdue bills and not spending money that isn't available.  He said that the cops checked on him the other day as well and it caused panic and paranoia. He told Roberts that when he talks to someone else, it helps to calm him down. He said that he does have the number to Crisis Care Center if he needs to call and talk to someone besides his mother.  Mr. B. shared that his mother has her own mental illness to deal with.  He thought maybe he would do better in a controlled environment where he is monitored, and medications adjusted.  He stated he had not been in a mental health facility where he can actually get inpatient help.  He also stated he felt a little bit better talking to his case

15

manager and voicing frustrations.  He was not sleeping much and took an

extra dose of Risperidone to help him sleep and calm down.  AR 501.

On September 4, 2020, Mr. B. saw Counselor Smith.  Mr. B. reported he

had been exhibiting a high volume of hearing voices, seeing images, and

becoming angry with collection agencies and his mother is the recipient of his

negative behaviors.  He was asked to review a safety contract which was

scanned into his file by the office staff in Hot Springs.  AR 496.  At that

session, Mr. B. was composed and focused.  He was able to tell the counselor

his name, date of birth, date, time, address, mother's name, and phone

number.  He had intermittent eye contact but more on than off.  His hygiene

was good and he appeared clean.  His eyes were bright and clear and he was

very calm and engaged.  He was able to stay on track and never derailed in

conversation one time.  He agreed that in the evening he seems to hear voices

and see things more.

During the day, he watched documentaries about World War I and World

War II.  He doesn't have conversations with his mother.  His therapist

encouraged him to thank his mother for everything she does for him.  He said

he doesn't hear voices or see images while in therapy.  She encouraged Mr. B.

to develop hobbies that would keep him busy and engaged.  At each weekly

session, Mr. B. remained focused, on track, and able to communicate in a calm

manner that made sense.  At that point, the counselor observed no signs of

schizophrenia during session.  The counselor encouraged Mr. B. to talk

with his case manager and work on a payment plan for the bill collectors.

16

His mother became afraid of him the other day as he became so angry over bill collectors.  Mr. B. admitted he has anger issues with controlling his temper that go back to his childhood.  Mr. B. was very calm during his session and stated he would try to use self-control.  He alleged that his CNP told his case manager it was okay for him to take an extra pill to help him calm down the other day. The counselor encouraged Mr. B. to take his medication as prescribed.  Mr. B. did mention that one Hot Springs Police Office was understanding and the other one that came out on a different day appeared intolerant and lacking in training pertaining to understanding his mental illness.  The counselor explained to Mr. B. that all his emails take a considerable amount of time for the case manager and counselor to read and process.  It would be nice to have a simple I am doing good versus the other.

It seemed that Mr. B. is lonely and attention seeking to his counselor. The counselor explained that they were going on vacation in a couple of days. His eyes did not, at that moment, seem to enjoy hearing that.  The counselor provided him with Crisis Care Center phone number in Rapid City, along with the National Suicide Prevention Line.  They reminded him that the safety contract would be scanned into his electronic file.  They encouraged him to work with his case manager and work on getting a library card so he could check out books that he likes at his local library.  The counselor encouraged Mr. B. to think about a hobby that would keep him busy and to come up with a payment plan.  AR 497-498.

17

On September 10, 2020, Mr. B. saw Case Manager Lynette Roberts outside of his home in Hot Springs.  He appeared to be tired; his eyes were red and tired looking.  He reported still having difficulty sleeping.  He would try Melatonin to help with sleep.  He felt his medication was starting to work as the symptoms were not as strong and constant.  They discussed doing other activities which he agreed.  He stated he would like to do activities, but he reported that his anxiety does not allow that most of the time.  Mr. B. agreed to meet next week and go to the library with his case manager to look for books on history.  AR 494.

On September 17, 2020, Mr. B. saw Case Manager Lynette Roberts outside of his home.  He appeared to be in fair spirits, and he was doing okay; his symptoms and voices were not as bad, and he stated he felt better after talking to his case manager and counselor every week.  AR 491.

On September 18, 2020, Mr. B. saw Counselor Smith for therapy.  Mr. B. felt his mental health was a level 4 on a scale of 1 to 10 and credited his medication, along with his case management and therapy.  He did not send one email in the 10 days that the counselor was on vacation, which was a positive sign.  He stated he is doing better and denied delusions or hallucinations.  He had been getting along better with his mother.  AR 488.

On September 22, 2020, Mr. B. had a telephone visit with Counselor Smith.  AR 483-485.  Mr. B. reported his mental health symptoms were at a 5 on that date holding in the middle of the road.  He expressed that he is very paranoid on the phone or Zoom.  His therapist said Mr. B. appeared to be

lonely and did not attach or bond to others, so now that he realized he has a strong team at BMS, he prefers to see them in person.  His therapist explained that may not always be possible because of our schedules.  Mr. B. had not sent one email for over three weeks, which was a record for Mr. B.  He said he is really trying to use self-control and thought blocking, along with occupying time in a productive manner.  His counselor repeated that Mr. B. is a good person, caring person and able to engage in meaningful activities that are positive.  Mr. B. stated he and his mom are getting along fine.  AR 485.

On September 24, 2020, Mr. B. saw case manager Lynette Roberts at his home.  Mr. B. appeared to be in fair spirits and took a short walk and talked about things.  He stated he felt fine and did okay on the walk as it was nearby his home.  He agreed to take another walk in the park next week.  Mr. B. also reported he felt better and will discuss medications with his CNP tomorrow. AR 482.

On September 25, 2020, Mr. B. saw nurse O'Connor for medication management.  AR 535-539.  Mr. B. stated he was feeling better than last appointment.  He had some anxiety and depression; his energy and concentration and sleep were improving, and he denied many negative thoughts.  AR 535.  Mr. B.'s mental status exam revealed: Mood: Depressed Anxious; Affect: Full; Speech: Underproductive; Thought process: Slowed thinking; Perception: Within normal limits; Hallucination: Denied None evidenced; Though content: Preoccupations/ruminations Obsessional Depressive Paranoid; Delusions: Reference; Cognition: Impairment of:

19

Attention/concentration; Intelligence estimate: Average; Insight: Partial insight; Judgment: Within normal limits.  AR 536.  His GAF was 41.  AR 538.  Mr. B. continued current medication regimens with increase in Risperidone for psychosis/sleep; increase in Topiramate for mood/headaches/bulimia.  AR 538.  O'Connor increased Fluoxetine for increased suicidal ideation.  His Zyprexa caused stomach issues and muscle twitches and was discontinued.  AR 539.

On September 29, 2020, Mr. B. saw Counselor Smith.  AR 476-479.  On that date, Mr. B. rated his mental health symptoms as a 9 on a scale of 1 to 10.  He was very clear in his conversation and his conversation made sense.  The counselor didn't note disorganized thinking.  Mr. B. said he did not want to leave the house and did not have a ride to therapy.  The counselor stated that they would either come over and talk outside of his house since he is a CARE client or arrange for his case manager to drive him to his session and he agreed.  His bulimia issues were better with proper medication.  He had been reading the books that his case manager provided.  Mr. B. stayed on topic and was easy to understand.  He denied hallucinations.  He heard voices telling him to kill himself but denied suicidal ideation.  He coped through reading and watching television, as well as taking his medication.  AR 478.

On October 1, 2020, he saw his case worker Lynette Roberts outside of his home.  Mr. B. stated he was doing okay, he was not talkative but was listening to what case manager shared with him and was answering questions.  He stated he does enjoy the visits, and it helps him to talk to other people and

20

get positive input and encouragement.  He did not disagree to getting his own place some day and living on his own or maybe going to Rapid City for one of the programs there at BMS.  He was willing to go on walks with case manager. AR 475.

On October 7, 2020, Mr. B. had a telephone visit with Counselor Smith. Mr. B. rated his mental health severity as a 9 this week on a scale of 1 to 10, although he was not coming into the office.  He was not using Zoom.  He claimed to feel less depressed, although depression had not been mentioned by him previously.  Mr. B. stated he was doing okay, and he was taking his medication.  The counselor encouraged that for therapy to be effective, it would be in Mr. B.'s best interest to start coming back into the office for his therapy. AR 472.

On October 8, 2020, Mr. B. saw Case Manager Lynette Roberts outside at his home.  Mr. B. was sitting outside waiting for her to get there and they walked for 15 minutes up and down the street by his home.  He was not feeling uncomfortable when walking with her, not anxious or nervous, and he shared some of his past.  He did not start conversations but would answer.  He reported feeling better and the depression was not as bad today.  He appeared to be expressionless during the walk and conversation.  There was no laughter or smile during their visit.  AR 469.

On October 13, 2020, Mr. B. returned to Counselor Smith for therapy. AR 463-466.  Mr. B. rated his mental health symptoms at a 7 on a scale of 1 to 10.  He reported bouts of depression over being denied his SSDI and is having

21

to appeal it with his mother's help.  He stated that he has not seen dark shadow figures but hears the voices telling him to kill himself, but he resists. He stated that to appease the voices, he conducts his bulimia ritual of inducing vomiting to the point that he feels dizzy and what he terms close to death.  He looked really worn out.  He was in his pajamas, growing a beard, and just looked very, very pale.  He said he is stressed out about the SSDI and his mother helped him with a lawyer over the internet.  His therapist was aware and all of the team members will review the form and fill it out and mail it back.  The patient notes indicated Mr. B. struggles hourly with his schizophrenia that leads to his bulimia.

BMS provided a safe set of people that support Mr. B., including CNP for his medication, case manager for support, and a counselor for mental health therapy.  Mr. B. said he had not been stable enough to work a job and he functions because he has a strong team supporting him along with his mother. Mr. B. had been close before to considering inpatient treatment, however, he fears being behind locked doors.  Without his team at BMS, Mr. B. would most likely be institutionalized.  He is trying to feel more whole and less burden by his voices, paranoia, and symptoms.  He was taking his medication as prescribed, he stated.  AR 465.  And he said he and his mother are getting along better.  AR 465.  The counselor's plan was to have Mr. B. take medication as prescribed and try to work on knowing that he is a good person, he is a caring person, and he is worthy of this life.  AR 465.

On October 15, 2020, Mr. B. saw Case Manager Lynette Roberts outside of his home.  AR 460-462.  He appeared to be in fair spirits, and he was able to smile and laugh a little bit.  He didn't mind walking up and down the street during our visit as he does not come out of the house on his own.  Mr. B. reported that his nephew was visiting, and he was enjoying that.  He reported that he does not eat much and when he does, it always has to come back up and make him not want to eat.  Mr. B. reported that he does not have uncomfortable symptoms after walking but feels fine.  AR 462.

On October 20, 2020, Mr. B. visited Counselor Smith at the Hot Springs BMS Office for individual therapy.  AR 456-459.  On that date, Mr. B. rated his mental health symptoms at a 9 on a scale of 1 to 10.  The counselor noted he made it to the office for his appointment which is a plus, but it took the counselor many reminders of encouragement for Mr. B. to show up.  His mother brought him to the appointment.  Mr. B. reported his depression was a little better thanks to the care team from BMS and his mother's ongoing support.  Mr. B. reported less shadow figures, but the voices were constant.  During times that he watches television, the voices are more mild but they become louder at bedtime, and he can only sleep three hours per night.

Mr. B reported that his bulimia is very bad.  They discussed coping strategies pertaining to the voices and the ritual of inducing vomiting.  Mr. B. does not like to go outside but his BMS Case Manager has been amazing in encouraging him to take walks with her.  As for hygiene, Mr. B. stated he has not brushed his teeth in over one year.  The counselor discussed this with him

in depth to encourage and promote better oral hygiene.  He stated he showers one time a month, maybe.  They then discussed better hygiene and showering. Mr. B. indicated that he changes his clothes once per month and his mom washes his clothing.  The counselor encouraged changing clothing more often. He wore his pajamas and they looked dirty today.  Mr. B. said that he and his mother are hoarders and that his mom allegedly never encouraged teeth brushing or showering.  He said his father had really bad mental problems, but his dad really tried to do better daily.

Mr. B. attempted to eat only soft food so it's less uncomfortable when he throws it up.  He had voices telling him to kill himself, and purging was a distraction and not engaging with the voices.  Mr. B. has no suicidal ideation nor homicidal ideation.  Mr. B. stated that he has a desire to live, said he would work on raising the bar of hygiene and working on mental health issues. AR 457-458.

On October 23, 2020, Mr. B. visited nurse O'Connor for medication management.  AR 541-545.  He reported doing okay and better than his last appointment.  O'Conner reported that his mood was stable; energy/concentration, sleep okay; he denied many negative thoughts.  AR 541. On mental status exam he was observed as follows: Mood: Euthymic; Affect: Constricted; Speech: Underproductive; Thought process: Slowed thinking; Perception: Within normal limits; hallucination: Denied None Evidenced; Though content: Preoccupations/ruminations Obsessional; Delusions: Reference; Cognition: Impairment of: Attention/concentration; Intelligence

24

estimate: Average; Insight: Partial insight; Judgment: Within normal limits. AR 542.

On October 27, 2020, Plaintiff returned to Counselor Smith.  AR 452-455.  Smith saw Mr. B. at the Hot Springs BMS Office for individual therapy. Mr. B. rated his symptoms as a 10 on a scale of 1 to 10, as he was very symptomatic on that day.  He was not the usual Mr. B. that comes into the office with a kind and gentle demeanor.  Rather, he had a very intense and mean look on his face.  He said that his voices tell him sometimes that the counselor and others at BMS are evil.  Mr. B. had a very dark and unusual persona on this day.  He claimed to be taking his medication as prescribed by his CNP.  Mr. B. stated the medications weren't lessening his voices.  He denied any shadow figures and has not seen them in a while.  He appeared to be communicating with his voices and reacting with facial gestures and head movements.  Mr. B. was in a very negative mood today.  He stated that he colors sometimes and has been sitting around more than anything.  The counselor encouraged him to work on a hobby.

Mr. B. seemed to want BMS to handle his collection agency bills and the counselor encouraged more self-control with owing money and perhaps having his mother write or call the bill collectors.  He had zero income and with his mental health considerations would slow down him being sued.  Mr. B. did not want to take personal accountability for his persistent former actions of charging and not having the means to pay for whatever he was purchasing.

25

The counselor informed Mr. B.'s case manager of her concerns.  Mr. B. denied suicidal ideations.  AR 454.

On October 29, 2020, Mr. B. saw Case Manager Lynette Roberts at his home.  Mr. B. was in fair spirits but still having issues with mental health.  He said he wanted to speak with his CNP about medications.  Mr. B. stated he had not been doing much but is coloring when he feels up to it.  He did not mind walking on their visits as it helps him get out of the house.  He appeared to be calm on that day and even smiled a little.  He stated that he may try increasing his dose of Melatonin to see if that helps him sleep more.  He shared that the voices haven't been as loud and constant as before, but he is hopeful they could diminish more.  He appeared to be calm today and focused on the visit.  AR 451.

On November 3, 2020, Mr. B. saw Counselor Smith.  AR 445-448.  Mr. B. did not know about medication increase so the counselor notified all the care team members at BMS.  She learned that the nurse had called Mr. B. and left a message but he did not answer.  The counselor indicated that nursing will address his medication changes and dosage with him directly.  AR 446.  On this visit the most he had been binging and purging was weekly.  He would like to find more balance.  Mr. B.'s mental health symptoms were at a 3 on a scale of 1 to 10, and he was doing better and feeling better.  He had less issues with voices and he coped through taking his medication, coloring, watching television and going for a walk with his case manager.  With respect to his paranoia, he was at a 5 on a scale of 1 to 10.  He was less paranoid, less angry,

26

and less splitting between good and evil selves.  When he became agitated or in a mean-spirited mood from the voices, his mother told him to knock it off and that usually causes him to snap out of it.  He wore his same pajamas and shirt.  He looked as though he had not had a shower in a while.  The counselor discussed better hygiene and teeth brushing with Mr. B. and encouraged better self-care.  AR 447.

On November 5, 2020, Mr. B. saw Case Manager Lynette Roberts at his home.  They took a walk in the neighborhood for 15 minutes or so.  He was in fair spirits, reporting he was doing okay, still not sleeping much but tried to rest as his symptoms are not as bad right now.  Roberts delivered his medication.  Mr. B. did not talk much during the visits unless asked a direct question, but he did say that he enjoyed the walks.  AR 444.

On November 10, 2020, Mr. B. saw Counselor Smith.  He had an increase in his medication and was talking really fast as if he were on a stimulant.  He stated that the voice had lessened since his medication increase. He stated he felt less depressed and had more energy.  AR 439.  He rated his mental health symptoms at a 9 on a scale of 1 to 10.  He stated that it's become like an addiction or a habit with respect to his bulimia.  He was appreciative for the book.  He said he had been trying to brush his teeth daily and shower more.  The counselor observed that his pajamas were covered in dog hair; his hygiene appeared fair; his eyes were clear; his affect was flat and he stared straight ahead.  He was talking very fast and it was difficult to understand him.  Mr. B. indicated he coped through watching television.  He

27

stated that he has no emotions, no desire, and no need for friendships.  He stated that he will take a walk with his case manager.  Counselor Smith noted that at this time, he could not care for himself independently without his mother's support.  AR 440.

On November 12, 2020, Mr. B. saw Case Manager Lynette Roberts at his home.  AR 437.  Mr. B. was quiet, and he stated he was doing okay.  He was still dealing with his symptoms which he states are better on some days and worse on other days.  He had dry, cracked lips that looked to be blood dried, which Roberts suggested he clean.  Roberts stated he had the look in his eyes like he was listening to someone other than me.  He would answer Roberts with one word yes or no, unable to carry on a conversation.  He did state that he liked the visits as it helped him, and he enjoyed the walks as well.  He said he does not do much of anything in the home.  They did not walk on that day due to the wind and the cold.  AR 437.

On November 17, 2020, Mr. B. had a telephone session with Counselor Smith.  AR 431-434.  The counselor was home sick but felt that since Mr. B. needed extra support, she agreed to a phone session.  AR 432.  Mr. B. reported that his mental health symptoms were at a 6 on a scale of 1 to 10 that week.  He had less voices intruding since the medication increase and no dark shadow images.  He was trying to brush his teeth and shower on a consistent basis.  His speech was not as rapid as it was noted last week.  He sounded much better.

28

He stated that his trigger is that South Dakota Medicaid had rejected his claim while he was waiting on his SSDI appeal.  He said he didn't understand why he did not qualify and it made him frustrated and angry.  He stated that he and his mother were getting along well.  Mr. B. does not agree to phone correspondence normally, so it was a good sign that he did on this day and he engaged with even mood and expression in his voice.  He did not seem to be able to function outside of his home.  He has no desire to engage with peers nor have a relationship with another person.  He stated he really does not feel compelled to do so.  He is simply struggling to maintain hygiene and being able to remain living at home with his mother who cares for him daily.  AR 433.

On November 18, 2020, Mr. B. saw Case Manager Lynette Roberts at his home in Hot Springs.  AR 428-430.  Mr. B. was in fair spirits, talking a little more than usual, and ready to take a walk.  He shared about wanting to reapply for Medicaid to get help paying for medication.  He also agreed to check into his SSDI status with the company that is helping him with that.  He was cooperative, stated he enjoyed the walks, and has been working on coloring as well.  AR 430.

On November 23, 2020, Mr. B. saw Case Manager Lynette Roberts at his home in Hot Springs.  He appeared to be in fair spirits, talking more than usual and stated he does enjoy the walks that we take on our visits.  They discussed art projects he could do to keep his mind on other thoughts.  They discussed listening to soothing music to help him sleep as he was still having trouble with sleep.  They discussed taking a shower before bed which may help

29

him to sleep as well.  He was in a pleasant mood that day and was able to carry on a conversation.  AR 427.

On November 24, 2020, Mr. B. saw Counselor Smith.  AR 421-424.  On that date, Mr. B.'s mental health symptoms were at a 4 on a scale of 1 to 10. Mr. B. stated his medication helped him to feel less paranoid.  He had not seen dark shadow figures and the voices are less.  He has had less issues with his bulimia.  He emailed the case manager, CNP and therapist that he believes he needs anxiety medication so he was not so worried about going out in public. On the phone appointment with Smith, he was calm, focused, and considerate.

Somewhere between the phone session and nighttime, he came up with a new ailment and need for medication for this ailment.  The counselor stated that this would be determined by a certified nurse practitioner if she thinks he needs another medication. Mr. B. is cared for by his elderly mother.  He was trying to brush his teeth daily and shower more often.  Counselor Smith noted, at this time in Mr. B.'s life, he would not be able to live alone and on his own. He required the daily assistance of his mother.  The counselor was hopeful that he will learn better daily life skills so he can function on his own in the event his mother is unable to take care of him any longer.  He was unable to handle money and budgeting. Mr. B. was inconsistent with his behaviors and daily life skills.  He coped through therapy, case management, medication management, a team approach, his mother caring for him, watching television, coloring and reading.  AR 423.

On December 1, 2020, Mr. B. saw Counselor Smith.  AR 417-420.

30

Mr. B.'s mental health symptoms on that date were at a 9 on a scale of 1 to 10.
He felt that he had anxiety and could not get out of bed because he needs
anxiety medication.  He could not make it to the office to see his therapist
because he just knew he had anxiety.  Smith was going to pass that
information along to Peggy O'Connor, his CNP.  Mr. B. had sent a long email to
his BMS team members stating that he had anxiety and needed anxiety
medication.  Mr. B. reported that the voices are less since the medication
increase, and there were no dark shadow figures.  He struggled with teeth
brushing, struggled with personal hygiene, and did not want to get out of bed.
He stated he will take a walk with his case manager.  He struggled with
bulimia.  He coped by reading a self-help book on bulimia.  He stated he is
grouchy and moody and feels angry when he can't get his way right away such
as getting on anxiety medication.  The counselor encouraged positive self-talk,
positive thinking, arts and crafts, coloring, watching a comedy on television
versus crime shows on murders and unsolved mysteries pertaining to murders,
taking a shower, brushing his teeth, changing his clothes, and helping his
mom around the house, vacuum.  AR 419-420.

On December 8, 2020, Mr. B. had another telephone visit with Counselor
Smith.  AR 410-413.  It was again a phone session as he is paranoid and does
not like Zoom and was too paranoid to come to the office.  He said he
experiences anxiety thinking about going out of the house.  AR 411. Mr. B.
reported a 5 on a scale of 1 to 10 as to how much he has been binging and
purging.   The counselor discussed how taking care of the body with proper

nutrition is important.  Mr. B. stated that he does not see any dark, shadowy figures.  He said the voices are less with the medication increase.  He stated that hygiene is an issue so they discussed selfcare.  He stated he lays around a lot.  He felt anxious, nervous, and is not sleeping well.  AR 412.  Counselor encouraged better self-care; establishing a routine for self-care and hygiene; more constructive daily activities; treat mealtime as if you are nurturing your body; positive thinking and positive self-talk.  AR 412.

On December 10, 2020, Mr. B. saw Case Manager Lynette Roberts at his home.  AR 407-409.  He was in fair spirits.  He was willing to walk again and stated that he enjoys the walks.  It's the only time he gets out of the house, gets fresh air and sunshine.  He stated he is interested in doing some kind of art project with the case manager and he thinks he would like to try to go to the library.  He was a bit more verbal today and attempting to have a conversation. They walked in the neighborhood for 20 minutes.  AR 409.

On December 15, 2020, Mr. B. had a telephone visit with Counselor Smith.  AR 404-406.  The appointment was by Telehealth as Mr. B. wanted session via phone as he was too paranoid to use Zoom or come to the office he stated.  AR 405.  On a scale of 1 to 10: 1 being least symptomatic and 10 being most symptomatic, Mr. B. described he was at a 10 not wanting to leave his house. He would like to be at a 5 in 6 months and a 3 in 12 months.  He stated he is so worried about leaving his house.  He reported less voices in his head but struggles with bulimia daily, poor hygiene, and no shadow figures.  He was

32

very nervous about his upcoming SSI case over the phone.  He coped through watching television and reading.  AR 406.

On December 17, 2020, Mr. B. saw Case Manager Lynette Roberts, at his home.  They met outside of his home, and they walked up and down the street for 20 minutes.  Mr. B. was in fair spirits reporting he was doing okay, and the symptoms were not as bad on that date but he is still struggling with anxiety and insomnia.  He reported the anxiety is the kind where he sweats, gets tense, and paranoid and does not want to be around others.  He shared a bit about his family and is looking forward to an appointment with Quick Aid and the judge.  He was hoping he will be successful.  Mr. B. appeared to be calm and stable today.  He did not appear to be listening to the voices today.  AR 403.

On December 30, 2020, Mr. B. met with nurse O'Connor at BMS.  He was irritable and reported insomnia.  He reported he was doing okay but struggling with depression, anxiety and not sleeping well.  No suicidal ideation today.  AR 396.  On mental status, Peggy O'Connor observed: Mood: Euthymic; Affect: Constricted; Speech: Underproductive; Thought process: Slowed thinking; Perception: Within normal limits; Hallucinations: Denied None evidenced; Thought content: Preoccupations/ ruminations Obsessional Paranoid; Delusions: Reference; Cognition: Impairment of Attention/Concentration; Intelligence estimate: Average; Insight: Within normal limits Judgment: Within normal limits.  AR 397.  GAF on that date was 41. Nurse O'Connor continued the medications of Trintellix, Topiramate, Risperidone.  She added medications Lamotrigine and Aripiprazole.  AR 399.

33

Nurse O'Connor noted that Mr. B.'s level of insight into his problems was fair, judgment was fair, and he had made minimal progress.  AR 399.

On December 3, 2020, Mr. B. saw Case Manager Lynette Roberts at his home.  He was in fair spirits, and he reported feeling somewhat depressed.  He had not slept well for some time and feels tired.  He reported he does enjoy walking and looks forward to it.  He walked up and down the street with Case Manager and did not seem to mind, or express any anxiety or nervousness when walking.  He stated he is glad he is able to walk.  They discuss counting our blessings for the things we can do as it could be worse.  Mr. B. agreed and shared that he does not do much of anything on his own unless he had company, so he feels safe.  AR 416.

**B.     Opinions as to Residual Functional Capacity**

**1.     Robin Carter-Visscher, May 31, 2020**

On May 31, 2020, Dr. Carter-Visscher reviewed Mr. B.'s medical records at the request of the Social Security Administration.  In considering the paragraph B criteria, Dr. Carter-Visscher found Mr. B. had mild limitations in understanding, remembering and applying information.  AR 98.  Mr. B. also had moderate limitations in interacting with others, concentration, persistence and maintaining pace and adapting or managing himself.  Id.  Dr. Carter-Visscher opined that Mr. B. has moderate limitations in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, interact appropriately with the general public, accept

34

instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting. AR 101-102. Dr. Carter-Visscher explained, "[s]ymptoms have improved with medication. Claimant can carry out repetitive, routine work tasks." AR 102.

### 2.   Mark Berkowitz, July 30, 2020

On July 30, 2020, Dr. Berkowitz was asked to review Mr. B.'s psychological records at the request of the Social Security Administration. In considering the paragraph B criteria, Dr. Berkowitz found Mr. B. had mild limitations in understanding, remembering and applying information. AR 98. Mr. B. also had moderate limitations in interacting with others, concentration, persistence and maintaining pace and adapting or managing himself. AR 98. Dr. Berkowitz opined that Mr. B. was moderately limited in his ability to maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance and be punctual with customary tolerances; work a normal work day work week without interruptions from psychologically based symptoms and perform at a consistent pace without unreasonable number and length of rest periods; interact appropriately with the generally public; get along with co-workers or peers without distracting them or exhibiting behavioral extremes and set realistic goals and make plans independent of others. AR 111-112.

Dr. Berkowitz opined Mr. B. is able to persist at tasks that can be learned in one to three months on the job. Mr. B. can work in coordination

with or proximity to others without being "unduly" distracted by them or exhibiting behavioral extremes and interact minimally with the public.  AR 112.

### 3.   Shauna R. Smith, Licensed Professional Counselor, October 27, 2020

On October 27, 2020, Counselor Smith submitted a Medical Source Statement.  AR 385-395.  She opined that Mr. B. was markedly limited in his ability to understand, remember or apply information, interact with others, maintain concentration, persistence or pace to complete tasks in a timely manner.  And that he was markedly to extremely limited in the ability to adapt or manage himself.  AR 385.

Counselor Smith explained that Mr. B. is very paranoid and could not handle nor adapt to changes.  "It takes an extremely flexible mental health team to help [Mr. B.].  Paranoid and misses appointments."  AR 385.  He depends on his mother to care for him.  Without help at this time he could end up in an inpatient or institutionalized.  AR 385.  His mental health team includes Counselor Smith who he started seeing on August 18, 2020, Lynette Roberts, his case manager from BMS, who he started seeing on March 11, 2020; and certified nurse practitioner Peggy O'Connor, who he started seeing on March 27, 2020.  AR 386.  Counselor Smith opined that his symptoms would be severe enough to interfere with his attention and concentration more than 25% of the day and that he would miss more than four days of work per month due to medical conditions, symptoms, side effects, appointments, or decompensation in a work setting.  AR 386.  He would also need at least 45 minutes of unscheduled break time during an eight-hour workday.  Id.

36

Counselor Smith opined that due to Mr. B.'s schizophrenia and bulimia, he has delusions, distrust and suspiciousness of others, detachment from social relationships, instability of interpersonal relationships, feelings of inadequacy, excessive need to be taken care of, he had marked limitations in his ability to understand, remember or apply information, interact with others, maintain concentration, persistence, or pace, and adapt to manage oneself.  AR 387.  She opined that Mr. B. does not have the capacity to adapt to changes in an environment or demands that are already not a part of his daily life.  AR 388.  He is not able to consistently perform activities within a schedule, maintain regular attendance and be punctual.  Id.  He is not able to sustain an ordinary routine without special supervision.  Id.  He is not able to accept and respond appropriately to criticisms.  Smith gave the example that form letters from bill collectors send him into a rage, as do comments from former supervisors.  AR 388.  He is not able to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  She describes he showers maybe once a month and hasn't brushed his teeth in over one year. AR 388.  His symptoms would be severe enough to interfere with attention and concentration more than 25% of the time.  AR 388.

## C.    Allison Podczerwinsky, Ph.D., March 22, 2021 – Post Hearing Interrogatories

On March 22, 2021, Dr. Podczerwinsky responded to post hearing interrogatories sent by ALJ Willis.  AR 568-578.  Dr. Podczerwinsky opined that he would have none to mild symptoms with respect to understanding and carrying out instructions, making judgments on work-related decisions.  AR

569.  She supports her opinions as follows, "[c]onflicted self-report, substance use and abuse, and personality traits."  AR 569-570, 577.

Dr. Podczerwinsky opined that Mr. B. had mild limitations in interacting with public, supervisor, co-workers, and responding to usual work changes in a routine work setting.  AR 570.  She supports her opinion indicating that he has personality traits noncompliance, and substance(s) use abuse.

Dr. Podczerwinsky opines that other capabilities are affected by his impairments indicating his ability to concentrate and manage oneself is affected by substance use abuse, personality traits, non-compliance.  He has mild limitations in managing himself and none to mild limitations in concentrating.  AR 570.  She opines that substance use and abuse impacts his impairments and that he could not manage benefits in his own interest because of substance use and abuse.  AR 570, 571.

## D.    Mr. B.'s Self-Reported Activities

### 1.    Functional Report April 29, 2020

Mr. B. reported he hears voices, has anxiety, his mood changes, and he thinks people are out to get him.  He sees the devil.  He sees the grim reaper. He feels like killing himself.  He does not like to leave the house.  He hates people.  AR 262.

Mr. B. reports that when describing his daily activities he states, "I don't sleep.  I mainly talk with my friends that inside and outside my head.  I most of the time stare at my walls."  AR 263.

Mr. B. reports that before his illness or injury he tried to be normal.  He

states, "I f***ing suck at it and my voices tell me all the time."  AR 263.  With

his personal care, he reports he wears the same clothes most of the time;

doesn't bathe a lot as it's hard to do and requires energy; doesn't have energy

to care for his hair; he goes long periods of time without shaving; he's able to

feed himself but purges up his food; sometimes has difficulty with using the

toilet and trembles being out in public.  AR 263.

  His mother reminds him to take meds and personal need and grooming.

AR 264.  His mother prepares his meals.  He can't concentrate on doing it

himself.  AR 264.  He doesn't do any house or yard work as he explains, "[m]y

days are hectic enough talking to my friends inside my head."  AR 264.  When

asked if he goes outside, he responds, "[n]ever.  F*** that.  I don't like people.

People want to kill me – f*** them."  AR 265.  When he does go out, he rides in

a car but doesn't go out alone as he doesn't trust himself going out alone,

because people want to kill him.  AR 265.  He also doesn't have the focus to

drive, medication screws with his vision.  AR 265.  He doesn't shop as he

doesn't like interaction with people.  His mother shops for him.  AR 265.  He

doesn't handle money because he doesn't have any money and his mother will

help him if he does.  AR 266.  He doesn't like interacting and doesn't like

people because people want to kill him.  AR 265.  He doesn't have hobbies or

interests.  He's too busy dealing with his medication and hearing voices.  He

doesn't want anything to do with people.  AR 266.  He doesn't have social

activities or places that he goes on a regular basis as he doesn't want anything

to do with people.  AR 266.

His impairments affect his talking, hearing, seeing, memory, completing tasks, concentration, understanding, following instructions, and getting along with others.  He explained he is on medication for some of these and others he would just rather not deal with people.  His medication and hearing voices makes it all hard.  He also has anxiety.  AR 267.  He is right-handed and can walk.  AR 267.  He can't pay attention for long as he has a hard time zoning other things out.  AR 267.  He is not often able to finish what he starts because he has a hard time concentrating and hears voices.  AR 267.  He doesn't get along with authority figures as he doesn't like authority or people.  AR 268.  He explained that he has been fired by Compass Group because he didn't get along with others.  AR 268.  He doesn't handle stress well – it makes his symptoms worse.  He doesn't handle changes in routine well.  AR 268.  He has unusual behavior or fears as he hears and sees things.  "People want to kill me.  F*** people and all people."  AR 268.  Mr. B. explains,

> I see and hear things others don't.  My therapist said I have schizophrenia.  Behavior Management Systems say I have schizophrenia.  Dr. Peggy from Behavior Management says I have schizophrenia.  I know my father had schizophrenia, but I imagine he gave me his illness.  I don't like life so much.  I don't like people so much.  I don't like waiting so much one of these days.  I do find life not living.[3]

AR 269.

---

[3] This court has reviewed the handwritten record submission by claimant and finds the source differs from the Statement of Material Facts: "I don't like writing so much.  One of these days I do feel like not living."  AR 269.

**E.      Third Party Reports**

   **1.      Function Form May 6, 2020 (Filled Out with Assistance from
         his Case Worker Lynette Roberts)**

Lynette Roberts, case manager at BMS, helped Mr. B. fill out the form.
The form stated: Mr. B. sits around his house, hears voices talking to him.  He
eats and throws up his food.  AR 271.  Mr. B. has a dog but his mom cares for
it.  AR 271.  He used to be able to work and socialize before his illness.  Id.  It's
difficult for him to sleep and he feels like he is going through mania all of the
time.  Id.

The form also stated: His mom reminds him to take medications as Mr.
B. forgets that.  AR 272.  His mom does the cooking.  Id.  He has difficulty
going outside.  He does try to go outside once a week.  AR 273.  He will ride in
a car but he needs a lot of encouragement.  He can drive but he chooses not to.
Id.  He can't focus enough to keep track of money or pay bills.  Id.  And he's not
able to manage and handle money on his own.  AR 274.  He doesn't go out and
do things on a regular basis as he does not like to socialize and was not going
anywhere at this time (May 6, 2020).  Id.  He has problems getting along with
people as he feels like people are out to get him and he does not like to be
around people.  AR 275.  Some days he can pay attention better than others
but generally it's only for about 10 minutes.  He can't follow instructions as he
gets angry and frustrated.  Spoken instructions are difficult as well due to the
voices in his head.  Id.  He does not like authority figures, doesn't handle stress
or changes in routine; and he fears that people are evil and reading his
thoughts.  He stays indoors and is fearful of going out.  AR 276.

41

### 2.    Donna B., June 21, 2020

Donna B., Mr. B.'s mother, lives with him and explains that a lot of the time they argue because of his disability.  AR 287. Donna B. indicated that: Mr. B. usually talks to voices all day and yells at things that he hears.  He will yell in anger and become physical by hitting objects.  Mr. B. will cuss at the things he hears and becomes combative with verbal assaults.  Mr. B. does not get along well with other people based on his disability.  AR 287.  Mr. B. usually stays to himself. Sometimes he will fall into a deep depression and never leaves his room.  He will talk with his voices all day and seems to be arguing with the voices by yelling at them and Mr. B. does get physical with his voices by throwing things at them.  AR 288.  Mr. B. has a dog but his mother takes care of the dog.  He does not seem to have interest in the dog and would not be able to take care of the dog without his mother.  Id.

Before his illness, Mr. B. was able to work and get along with others and he was able to talk normal and make more sense on his speech.  He was able to communicate with others better and manage his life better before his illness. Id.  Mr. B. does not sleep much and has a hard time sleeping at night.  He will be awake for multiple days.  He will walk around as if he is a zombie because of his lack of sleep.  Id.

With respect to his personal care, Mr. B.'s mother describes that he rarely changes his clothes and takes no concern in his clothes; seldom bathes because he lacks the energy; does not care for his hair and leaves it dirty; does not shave and will leave his beard dirty; he will feed himself but then he will

42

binge eat and vomit; he has irregular bowel movements due to his eating disorder; he will not clean up and lives a dirty life.  Id.  Mr. B. needs to be reminded constantly about taking care of himself.  He does not like to take care of himself and will not if there are not reminders to do so.  AR 289.  "I give [Mr. B.] daily reminders for him to take his medication.  He will forget to take them if he is not reminded.  I usually have to set his medication out and remind him continuously."  Id.  Mr. B. does not prepare his own meals.  He does not have the concentration.  Id.

Mr. B. doesn't do any house or yard work.  He just doesn't have the concentration required to.  Id.  Mr. B. has a hard time because of his mental health and fighting his depression.  He cannot concentrate and cannot handle too much mental stimuli or he will become enraged and have breakdowns.  AR 290.  Mr. B. rarely goes outside.  He feels the world is after him and is paranoid.  Id.

Mr. B. will ride in a car but doesn't generally go out alone because he gets paranoid when he is out and needs support because of it.  Id.  Mr. B. doesn't drive because he is unable to focus long enough to drive.  He also gets paranoid and will not drive because he feels people are after him at all times.  Id.  Mr. B. would shop by a computer if he could avoid people and not go outside.  Id.  Mr. B. doesn't shop.  He doesn't have concentration and he can't deal with shopping; he gets frustrated.  Id.  Mr. B. seems to be not present most of the time and would have a difficult time with paying bills, counting change, and handling a savings account.  He lacks concentration.  Id.

Mr. B. was able to handle money before but now doesn't seem present enough to do so.  He seems like he is in another world much of the time.  AR 291.

Mr. B. doesn't have any interests.  He mainly sits around or lays around talking with his voices.  He seems to be occupying his time in another reality. Id.  Mr. B. sits around talking to his voices all day, every day and seems to be lost.  "Sometimes I wonder if he is even really active and present in this world." Id.  Mr. B. used to be able to get out and be outside.  Mr. B. cannot handle anything anymore and will not do anything because he is mentally sick.  I honestly do not know what to do most days with him because his mind is so fragile.  Id.  Mr. B. doesn't associate with anyone and doesn't go anywhere on a regular basis.  He feels paranoid now and will not go anywhere or do anything. He feels like others are after him and he needs to stay inside.  Id.  If he does go anywhere, he should have someone accompany him for his safety and that of society.

Mr. B. can't focus, will get angry and become violent.  Id.  Mr. B. tends to get angry often and will become violent.  He argues with anyone because he lacks control over his thoughts.  AR 292.  Mr. B. used to be able to socialize but since his illness, he cannot socialize correctly and will not socialize.  He gets paranoid around anything and everything which does not work well with his schizophrenia.  Id.  Mr. B. has a difficult time talking, hearing, seeing, memory, completing tasks, concentration, understanding, following instructions and getting along with others.  He cannot talk right or hear because he is arguing with voices.  He sees things that are not there.  He

44

cannot complete tasks or follow instructions because of his concentration.  He likes to yell at others and gets upset with others.  Id.  Donna B. indicated that Mr. B. can only pay attention for about five minutes; cannot follow written instructions.  He does not seem present at the moment.  Mr. B. seems as though he is not in reality and cannot concentrate or follow written instructions.  He has a hard time hearing others with the voices being present and cannot follow spoken instructions either.  He will get angry and act out or try to self-harm because of not being present in the moment.  Id.  Mr. B. doesn't get along well with authority figures.  He was fired for not getting along with authority figures and co-workers.  When he worked at the Compass Group, he thought his boss was reading his mind and thoughts and he got angry and was fired.  AR 293.

Mr. B. doesn't handle stress well and becomes worse, more paranoid and harms himself more with added stress.  He can't handle changes in routine, becomes angry.  Id.  Mr. B. feels that people are after him and he thinks people will kill him.  Mr. B. did tell me that he was going to kill himself at the end of the year and seemed like he had it all planned out.  Id.  On top of Mr. B.'s schizophrenia, he has an eating disorder.  He will binge eat and vomit or purge after every meal.  He does the binging and purging three times a day.  He leaves our house smelling like vomit.  Mr. B. tries to self-harm himself through this manner.  Donna B. stated,

> I do find that he needs a lot of help with mental abilities.  I know he has been working with BMS but they can only do so much for him.  [Mr. B.]'s not going to get better with time and I have been told he keeps getting worse.  He does talk about killing himself and

45

if he does not get better, I do not want that for him.  I am hoping Social Security can help him and give him a purpose to live.  I'm afraid he might kill himself at the end of the year. He tells me all the time he feels like he is getting worse by the day.

AR 294.

### 3.    Donna B., August 27, 2020

Mr. B.'s mom explained that he continues to "depreciate" in his health. He tried his best but will always not be able to function normally.  He struggled daily with his life and most days does not feel like living.  He felt that the voices want to harm him and he feels like he is going to die because voices want him to die.  He felt the voices are controlling his life and will always control his life. He tried to feel better but the majority of the week he cannot function.  AR 295.

Mr. B. struggled with his voices, not wanting to leave the house, anxiety, depression, expressing himself.  He struggled with his eating disorder and always needed to eat and then purge because he wants to feel in control of his life. Id.  He was trying to get help and wants to get help.  He tried to stay positive but his struggles make it difficult.  He was trying to switch to a new medication because his current med is not working well.  He cannot function through life and has difficulty with daily tasks.  He does not have the capacity to sustain his daily life and is trying his best.  Id.

Mr. B. received support from BMS through having a case manager Lynette Roberts, therapists Brian Matthis and Shauna Smith, and nurse practitioner Peggy O'Connor.  He was supportive of making his appointments and trying to better his life, but still struggles.  He wanted to become better but the likelihood that he will ever function normally is never going to occur.  He

46

would never be a normal individual and never fit into normal society.  He has multiple disorders which make his life difficult and does need support for the rest of his life to function normally.  AR 296.

Mr. B. is receiving assistance from the State with SNAP which allows him to have a food source.  He struggles and working has never helped with his struggles and disorders.  He appreciates the assistance of having SNAP because it allows him to get by with having a source of food.  Id.

**F.    Testimony at Administrative Hearing**

**1.    Testimony of Mr. B**.

Mr. B. testified he quit working in February of 2020.  "I was thinking that they were going to kill me there, and I was having paranoia that they (his co-workers and the manager) were trying to kill me, and they were trying to poison me."  AR 73.  He has dealt with paranoid thoughts in other settings as well.  He explained when he was working as a paraprofessional at the Old Forge School District in 2015, he had paranoid thoughts and that's primarily why he quit working there too.  AR 74.  His paranoia, hallucinations, hearing voices and seeing things started back in 2015 when he was working as a paraprofessional at the Old Forge School District.  Id.

He started getting mental health treatment last year (2019) when it started getting really bad.  He'd had some treatment before but then he found BMS.  Id.  He explained his condition was getting worse in 2019.  He was withdrawing from society.  He used to like the outdoors, but he started staying

47

in his house and not going anywhere.  His eating disorder also started getting worse.  It started setting off the voices with his eating disorder.  AR 74-75.  Mr. B. explains that he eats and vomits three times a day because of the voices telling him to kill himself.  AR 75.  Mr. B. explained that his therapist tells him that his vomiting is a result of his trying to disassociate with his voices. Id.  Mr. B. is trying different medications in hopes that he will improve with medications and with counseling.  Id.  He has a therapist session each week, every Tuesday he talks to his therapist for 30 minutes and has a medication management appointment every month.  AR 75-76.  His counseling and medication management is very helpful for him.  It really helps with the delusions and helps him kind of see where he's going wrong with the delusion.  AR 76.  Mr. B. explains he has delusions about people trying to kill him and people being after him.  "I create profiles on people thinking that they are after me and that they are trying to poison me." Id.  His therapist will try and set him straight that they aren't and that people are good and that people at Behavior Management are his friends.  Id.  Mr. B. testified,

> I don't like authority figures even with law enforcement.  I've had the cops called on me before because I was trying to kill myself and I kind of get violent with law enforcement.  There's been a time when they wanted to arrest me, and my mom said that I calmed down so I have issues with authority figures.  I don't shower. Usually it's once a week that I shower.  I've been working with my therapist trying to brush my teeth and trying to shower.  I let my hair grow out real long and I don't like to shave.  Bathing and showering is hard for me.  Pretty much my daily life is difficult for me no matter what.  There is always stuff in my beard and even with my daily life trying to make my appointments, my mom has to drive me because I don't drive because the medication is sedating so it's very difficult for me.

48

AR 77.

Mr. B. has never lived independently.  AR 77-78.  He explained that he has problems with his hygiene as he just doesn't remember to shower and then one day if he remembers to he doesn't want to do it.  He doesn't have motivation to do it.  AR 78.  His mother is paying his living expenses and without her, he would be homeless.  Id.  He doesn't help around the house, he gets too agitated.  AR 79.  He would have difficulty doing regular tasks if they were assigned and wouldn't remember to do them.  Id.  Mr. B. explained that he has had other paraprofessional jobs that have ended the same way where he gets delusional with people who he thinks are trying to kill him and are after him.  Even with family members, he's had thoughts that they have been after him before.  AR 79-80.  When he is having delusional thoughts thinking someone is going to kill him, he tries to stay away from them and just walks away and isolates himself.  AR 80.  He explained that his last part-time job was good for a while and then once the episodes started that's when he stopped.  He explained when asked whether he voluntarily quit or was fired he said it was a mutual understanding.  Id.

Mr. B. explained that he hopes medications will help to get his mental health under control.  Id.  Mr. B. explains that his most limiting features are his delusions and his anxiety.  He has voices that come and tell him to kill himself and that he is no good, worthless.  He also has depression and agoraphobia.  AR 81.

### 2.    Testimony of Vocational Expert ("VE") Anne Arrington

VE Arrington was asked the following hypothetical:

[A]ssume the hypothetical individual of the claimant's age, and
education, with that past work that you just described, but further
assume the individual has got the following mental limitations,
that the individual would be limited to routine, repetitive, unskilled
work tasks.  The individual would be limited to simple work-related
decisions utilizing judgment or dealing with changes in the work
settings.  The individual could only occasionally interact and
respond appropriately with supervisors, coworkers.  It could be up
to the occasional, but it would be incidental contact in the
workplace.  His job would not require a coworker to complete his
job.  Likewise, the hypothetical individual's job would not require
interaction or responding with members of the general public.  The
individual could be off task up to five percent of an eight-hour
workday, and absent from work one day a month.  With those
limitations at the nonexertional level, could the hypothetical
individual perform that past work as you described it as actually or
generally performed?

AR 86-87.

VE Arrington responded that such a hypothetical person could not do

the past relevant work.  AR 87.

VE Arrington identified other jobs that could be performed including:

(1) Commercial cleaner DOT 381.687-014, unskilled heavy work, more than

250,000 in the United States; (2) Industrial cleaner 381.687-018 SVP 2,

unskilled, medium, more than 400,000 in the United States; (3) Hospital

cleaner 323.687-010 SVP 2, unskilled, medium, more than 54,000 in the

United States.  Id.

VE Arrington testified if someone were to miss two to three days per

month absenteeism that they could not perform the jobs listed and could not

identify any jobs that could be performed with that rate of absenteeism.  AR 88.
If time off tasks were 10% or greater at a job, Arrington testified that someone
could not sustain competitive employment with that level of time off task.  Id.

VE Arrington testified that if a person was required to be in complete
isolation with no co-worker or supervisor contact, they would not be able to
perform competitive work.  AR 90-91.

## DISCUSSION

### A.    Standard of Review

When reviewing a denial of benefits, the court will uphold the
Commissioner's final decision if it is supported by "substantial evidence [i]n the
record as a whole."  42 U.S.C. § 405(g); Minor v. Astrue, 574 F.3d 625, 627 (8th
Cir. 2009) (citing Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997)).
"[S]ubstantial evidence [is] defined as 'more than a mere scintilla.  It means
such relevant evidence as a reasonable mind might accept as adequate to
support [the Commissioner's] conclusion.' " Klug v. Weinberger, 514 F.2d 423,
425 (8th Cir. 1975) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).
"This review is more than a search of the record for evidence supporting the
[Commissioner's] findings, and requires a scrutinizing analysis, not merely a
rubber stamp of the [Commissioner's] action."  S. ex rel. S. v. Astrue, 529 F.3d
818, 821 (8th Cir. 2008) (internal quotations and citations omitted).  Yet, "[i]n
conducting [its] limited and deferential review of the final agency determination
under the substantial-evidence standard, [the court] must view the record in

the light most favorable to that determination.  Chismarich v. Berryhill, 888
F.3d 978, 980 (8th Cir. 2018).

      In assessing the substantiality of the evidence, the evidence that detracts
from the Commissioner's decision must be considered, along with the evidence
supporting it.  Minor, 574 F.3d at 627.  The Commissioner's decision may not
be reversed "merely because substantial evidence would have supported an
opposite decision."  Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)
(quoting Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)); Reed v.
Barnhart, 399 F.3d 917, 920 (8th Cir. 2005).  "[I]f it is possible to draw two
inconsistent positions from the evidence and one of those positions represents
the [Commissioner's] findings," the Commissioner must be affirmed.  Oberst v.
Shalala, 2 F.3d 249, 250 (8th Cir. 1993) (quoting Robinson v. Sullivan, 956
F.2d 836, 838 (8th Cir. 1992)).  "In short, a reviewing court should neither
consider a claim de novo, nor abdicate its function to carefully analyze the
entire record."  Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000)
(citations omitted).

      The court must also review the decision by the ALJ to determine whether
an error of law has been committed.  Smith v. Sullivan, 982 F.2d 308, 311 (8th
Cir. 1992); 42 U.S.C. § 405(g).  A court must evaluate whether the ALJ applied
an erroneous legal standard in the disability analysis.  Erroneous
interpretations of law will be reversed.  Walker v. Apfel, 141 F.3d 852, 853 (8th
Cir. 1998) (citations omitted).  The Commissioner's conclusions of law are only
persuasive, not binding, on the reviewing court.  Smith, 982 F.2d at 311

("appropriate deference" should be given to the SSA's interpretation of the Social Security Act).

**B.      The Disability Determination and the Five-Step Procedure**

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 416(I), 423(d)(1)(A); 20 C.F.R. § 404.1505.[4]  The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is disabled.  This sequential analysis is mandatory for all SSI and SSD/DIB applications.  Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520.  The five steps are as follows:

Step One: Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b).  If the applicant is engaged in substantial gainful activity, she is not disabled and the inquiry ends at this step.

Step Two: Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e., whether any of the applicant's impairments or combination of impairments significantly limit her physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c).  If there is no such impairment

---

[4] Although Mr. B. has applied for both Title II and Title XVI benefits, for the sake of simplicity, the court herein cites to only the regulations applicable to Title II where the corresponding Title XVI regulation is identical.  It is understood that both Titles are applicable to Mr. B.'s application.  Any divergence between the regulations for either Title will be noted.

or combination of impairments, the applicant is not disabled and the inquiry ends at this step.  NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe.  <u>Browning v. Sullivan</u>, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 404.1520a.  This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

Step Three: Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404.  20 C.F.R. § 404.1520(d).  If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry.  <u>Bartlett v. Heckler</u>, 777 F.2d 1318, 1320 n.2 (8th Cir. 1985).  This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work.  <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).  If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment*, the ALJ must proceed to step four.  NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing.  20 C.F.R. § 1520a(c)(2).

Step Four: Determine whether the applicant is capable of performing past relevant work (PRW).  To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe*) to determine the applicant's residual functional capacity (RFC).  If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled.  20 C.F.R. §§ 404.1520(e)-(f); 404.1545(e).  If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five.  20 C.F.R. §§ 404.1520(f).

Step Five: Determine whether any substantial gainful activity exists in the national economy which the applicant can perform.  To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience.  20 C.F.R. § 404.1520(g).

## C.   **Burden of Proof**

The plaintiff bears the burden of proof at steps one through four of the

five-step inquiry.  <u>Barrett v. Shalala</u>, 38 F.3d 1019, 1024 (8th Cir. 1994);

Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a). The burden of proof shifts to the Commissioner at step five. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Clark v. Shalala, 28 F.3d 828, 830 (8th Cir. 1994). "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999). The burden shifting is "a long-standing judicial gloss on the Social Security Act." Walker v. Bowen, 834 F.2d 635, 640 n.3 (7th Cir. 1987). Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

## D.   Assignments of Error

Plaintiff asserts three errors. First, Mr. B. alleges that the ALJ's credibility determination is not supported by substantial evidence.[5] Docket No. 22, p. 1. Second, plaintiff alleges that the ALJ erred in failing to find that the plaintiff met or equaled a listing §§ 12:03, 12:13, and 12:06. Id. Third, plaintiff alleges that the ALJ's RFC finding is not supported by substantial evidence. Id.

---

[5] The government in their brief frames the first issue as, "[w]hether substantial evidence supports the ALJ's symptom evaluation finding." Docket No. 24, p. 2. This is a more accurate statement of the issue under SSR 16-3p which states, "[the SSA] is eliminating the use of the term 'credibility'. . . we instruct our adjudicators to consider all the evidence in an individual's record when they evaluate the intensity and persistence of symptoms." SSR 16-3p, 2017 WL 5180304 *2 (10/25/17). This restatement on the first issue does not alter the analysis by this court.

## 1.  Whether the ALJ's credibility determination is supported by substantial evidence.

The ALJ found that Mr. B.'s severe medical impairments could reasonably be expected to cause his alleged symptoms, however the ALJ discounted Mr. B.'s statements about the intensity, persistence, and limiting effects of his symptoms as, "not entirely consistent with the medical evidence and other evidence in the record."  AR 26.  The ALJ supported its conclusion with evidence in the record of the following:

(1) Despite these allegations, mental status examination findings showed the claimant was well groomed, calm, and exhibited normal psychomotor activity, average estimated intelligence, normal judgment and insight, logical thought processes, normal perception, clear speech, and the ability to remain focused and the ability to communicate in a calm manner.[6]

AR 26 (citing 2F/9, 17, 27; 4F/2, 102, 135).

(2) The claimant told providers that he retained the ability to shop online, color, read, and watch television.

[Mr. B.] also exhibited the ability to testify at his disability hearing via telephone.

AR 27 (citing 3E; 4F/38, 102), AR 25

(3) [Mr. B.] retained the ability to count change and use a checkbook and money order.

AR 27 (citing 4E)

(4) [Mr. B.] was prescribed medication, including Zyprexa, Risperidone, and Trintellix, to treat his symptoms.  [Mr. B.] also underwent other treatment modalities, including therapy. Providers noted some improvement and stabilization of [Mr. B's] symptoms with treatment.

---

[6] The government cites this as "normal mental status examination results". Docket No. 24, pp. 8, 12-14.

AR 27 (citing 2F/18, 26, 32, 4F/140).

Plaintiff alleges that these are not "good reasons" to reject claimant's credibility regarding his symptoms, and do not amount to the required substantial evidence under established SSA regulations and Eighth Circuit precedent.  Docket No. 22, pp. 11-12; see Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007); SSR 85-16, 1985 WL 56855 *2 (1/1/85)).  The government argues that the ALJ "provided valid reasons for his assessment of Plaintiff's subjective complaints regarding his mental problems and other limitations." Docket No. 24, pp. 5-6; Schultz, 479 F.3d at 983; Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004); see Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984)).

ALJs must consider all the evidence in an individual's record when they evaluate the intensity and persistence of symptoms after they find that the individual has a medically determinable impairment.  See SSR 16-3p, 2017 WL 5180304 *2 (10/25/17) (ALJs must consider subjective complaints and non-medical evidence at step three and step four).  "The ALJ is in the best position to gauge the credibility of testimony."  Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).

ALJs "may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them."  Polaski, 739 F.2d at 1322.  Objective medical evidence is one of many factors an ALJ must consider in evaluating the credibility and testimony and complaints.  Id. The Eighth Circuit laid out these factors in Polaski to include:

> [t]he claimant's prior work record, and observations by third
> parties and treating and examining physicians related to such
> matters as: (1) the claimant's daily activities; (2) the duration,
> frequency and intensity of the pain; (3) precipitating and
> aggravating factors; (4) dosage, effectiveness and side effects of
> medication; (5) functional restrictions.

Id.

ALJs should, but are not required to, consider all of the Polaski factors. Schultz, 479 F.3d at 983; Strongson, 361 F.3d at 1072. "The ALJ may disbelieve subjective complaints if there are inconsistencies in the evidence as a whole, but he must give reasons for discrediting the claimant. Goodale v. Halter, 257 F.3d 771, 774 (8th Cir. 2001); Jones v. Callahan, 122 F.3d 1148, 1151 (8th Cir.1997). "The court will defer to the ALJ's credibility finding as long as it gives a good reason for doing so." Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir.2001) (quoting Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir.1990)). "It is sufficient if he acknowledges and considers [Polaski] factors before discounting a claimant's subjective complaints." Strongson, 361 F.3d at 1072.

In Schultz, the ALJ never expressly cited the Polaski factors when evaluating the claimant's subjective complains, yet it followed 20 C.F.R. §§ 404.1529 and 416.929, which largely mirror the Polaski factors. Schultz, 479 F.3d at 983.

> The ALJ found the objective medical evidence did not support
> Schultz's subjective complaints and Schultz had a good work
> history. The ALJ also found (1) Schultz spends most days sitting
> at home watching television, although this is by choice and not for
> any medical reason; (2) the signs of chronic and severe
> musculoskeletal pain are not present; (3) nothing exists regarding
> precipitating and aggravating factors; (4) medications control
> Schultz's hypertension, nausea, and vomiting, and Schultz neither
> takes strong doses of pain medication nor experiences adverse

side-effects; and (5) no doctor has limited Schultz's ability to stand, sit, walk, bend, lift, or carry.  We conclude the ALJ adequately, if not expressly, applied the <u>Polaski</u> factors and discounted Schultz's subjective complaints of pain.

<u>Id.</u>

Also, in <u>Strongson</u>, the ALJ did not explicitly discuss each <u>Polaski</u> factor, however the ALJ stated that he was considering the factors and discussed why Strongson's testimony was not fully credible.  <u>Strongson</u>, 361 F.3d at 1072.

> [The ALJ] stated that her testimony at the hearing was inconsistent with the reports of her routine daily activities and with the medical clinical findings and the course of her medical treatment.  In addition, he noted that there was no evidence that Strongson's condition was worse after she was terminated than before; the nature of her pain complaints migrated from one location to another; trigger points were not identified to support her claimed fibromyalgia; tests did not support her claimed rheumatological disorders; and her residual functional capacity was such that she had been able to help remodel her own home.  Finally, the ALJ found that Strongson, who was living with her boyfriend and was receiving alimony, was lacking in her motivation to return to the work force.

<u>Id.</u> at 1069.

In both cases cited by the government in brief, the Eighth Circuit affirmed the ALJ's credibility finding because the ALJ addressed some, if not all, of the <u>Polaski</u> factors, and substantiated its conclusion with many citations to medical evidence, third party testimony, and the claimant's daily activities. The question before this court then is not whether the ALJ provided "good reasons" for discounting Mr. B.'s subjective complaints as plaintiff suggests, rather it is whether the ALJ considered and analyzed the <u>Polaski</u>/20 C.F.R. §§ 404.1529, 416.929 factors and supported its conclusion with substantial evidence.  This court finds that although the ALJ loosely followed the <u>Polaski</u>

analysis, the ALJ erred when it failed to justify its discounting of Mr. B.'s symptoms with substantial evidence.

At Step Two, the ALJ found that Mr. B. had the following severe impairments: depression; anxiety; bulimia nervosa; and schizophrenia.  AR 24. The ALJ then considered the intensity, persistence, and limiting effects of Mr. B.'s symptoms to determine the extent to which they limited his work-related activities.  AR 26.  At the hearing, Mr. B. testified to his ongoing mental symptoms that affected his ability to work, including his depression, agoraphobia, and paranoia.  Id.  "He stated that he felt that people were after him and did not do well with authority figures.  Additionally, he stated that he heard voices that were telling him to kill himself."  Id.  Mr. B. also testified that he lived with his mother and needed her to take him to his appointments and remind him to maintain personal hygiene.  Id.  After considering Mr. B.'s testimony, the ALJ determined that Mr. B.'s symptoms were not entirely consistent with the evidence.  Id.  This court will address the record evidence cited by the ALJ justifying its conclusion using the Polaski factors identified in the ALJ's opinion.

### a.    The Polaski Factors

#### i.    The Medical Evidence

Mr. B. reported symptoms of auditory and visual hallucinations, anhedonia, depression, appetite changes, low self-esteem, concentration difficulties, suicidal ideation, and sleep difficulties.  Id. (citing 2F/6, 10, 30; 4F/16, 23, 102, 112, 134).  The ALJ acknowledged that examining providers

had noted Mr. B.'s anxious mood, constricted affect, poor hygiene, paranoid thought content, auditory and visual hallucinations, impaired judgment, slowed and tangential processes, impaired attention and concentration, erratic and inconsistent memory, ruminating and preoccupied thought content, self-deprecation, a dark demeanor, and reactive behaviors to hallucinations.  AR 27 (citing 2F/9, 17, 31; 4F/2, 11, 59, 135).

The ALJ in multiple parts of the opinion discounted this evidence by stating:

> Despite these allegations, metal status examination findings showed the claimant was well groomed, calm, and exhibited normal psychomotor activity, average estimated intelligence, normal judgment and insight, logical thought processes, normal perception, clear speech, and the ability to remain focused and the ability to communicate in a calm manner.

AR 26 (citing 2F/9, 17, 27; 4F/2, 102, 135).

This evidence cited by the ALJ does not contradict Mr. B.'s complaints as purported.  Instead, it largely supports the symptom assertions by both Mr. B. and his medical team.

Record cite 2F/9 is an examination by Brian Mathis, LCSW-PEP, QMHP on March 31, 2020.  AR 358.  Mr. Mathis does note that Mr. B. is appearing well-groomed, with average intelligence, however also notes: his attitude is "Defensive Mistrustful," his mood is anxious; speech pressured; thought process tangential loose; hallucinations, auditory command visual tactile; thought content paranoid; cognition, impairment of attention/concentration, ability to abstract, erratic/inconsistent

memory.  Id.  Mr. Mathis notes when answering questions, "[Mr. B.] would then become derailed jumping from subject to subject."  AR 359.

Record cite 2F/17 is an examination by Peggy O'Connor, CNP on March 27, 2020.  AR 366.  CNP O'Connor notes Mr. B. was depressed, anxious, angry, had clear speech, had logical thought process, auditory and visual hallucinations, was preoccupied with ruminations obsessional depressive paranoid self-deprecation, and impairment of attention and concentration.  AR 366.

Record cite 2F/27 is a report by case manager Lynette Roberts on June 1, 2020.  AR 366.  Ms. Roberts did not perform a mental status exam on Mr. B.  Id.  She noted that Mr. B. "appeared calm and stable today . . . he is not hearing voices as much or as loud, its [sic] is during the nighttime that he suffers the most . . . he still purges at times." AR 376.

Record cite 4F/2 is an examination by CNP O'Connor on December 30, 2020.  AR 396.  CNP O'Connor notes Mr. B. was euthymic, had constricted affect, speech was underproductive, had slowed thinking thought process, no hallucinations, was preoccupied with ruminations obsessional paranoid, and impairment of attention and concentration. AR 397.

Record cite 4F/102 is report by Shanua Smith, MS, LPC, QMHP, NCC on September 5, 2020.  AR 498.  LPC Smith did not conduct a mental status examination.  MS Smith reported, "[Mr. B.] has been

exhibiting a High Volume of hearing voices, seeing images, becoming angry at the collection agencies and his mother is the recipient of his negative behaviors." Mr. B. stated, "the police make him angry when they come over." During the meeting, Mr. B. was composed and focused, had intermittent eye contact, but was calm and engaged. AR 497.

Record cite 4F/135 is an examination by CNP O'Connor on August 28, 2020. AR 529. CNP O'Connor notes Mr. B. was depressed, anxious, full affect, speech was underproductive, had slowed thinking thought process, auditory hallucinations, was preoccupied with ruminations obsessional depressive, delf-deprecatory, and impairment of attention and concentration. AR 530.

The record evidence does not support the ALJ's credibility assessment of Mr. B.'s symptoms with substantial evidence. Mr. B. appeared "well groomed" at one ALJ record cite and having "average estimated intelligence" throughout. That's where the similarities of the ALJ's review of the record and the actual record end. AR 358, 366, 497, 530.

No provider other than Mr. Mathis in the ALJ's citations reported on Mr. B.'s appearance. The record as a whole, contains substantial evidence of Mr. B. issues with hygiene. "I don't shower. Usually it is once a week. . . . There's always stuff in my beard." AR 77. There are other examinations in the record that comport with Mr. B.'s testimony at the hearing. AR 361 (showering once a week, wears same clothes for a

month), AR 423 (Mr. B. stated that he is trying to brush his teeth daily
and shower more often).

Rarely did Mr. B. have "clear speech" and exhibit "calm" behavior.
The ALJ's record cites, and the record as a whole, reflect substantial
evidence of Mr. B.'s consistent symptoms of depression, anger, paranoia,
hallucinations, trouble with speech, impaired thought processes,
and cognition.

### ii.    Daily Activities

Mr. B. testified, "I don't do anything around the house," when asked if he
does any chores.  AR 79.  Mr. B. discussed how his mother drives him to his
appointments and pays for everything that he uses at the house.  AR 78.
"Without her, I wouldn't have any housing."  Id.  When asked what his
problems were with completing chores like cleaning his room or taking out the
trash, Mr. B. stated, "I would have difficulty by doing that.  I wouldn't even
remember to do it."  AR 79.  Mr. B. stated he has withdrawn from society due
to his impairments, that he used to like the outdoors, now he stays in his
house.  AR 74.

Mr. B. disclosed on his social security function report that he doesn't
sleep, he talks to friends inside his head, his mother prepares all his meals
that he frequently purges, and he doesn't have hobbies.  AR 262-269 (citing
3E).  "[Mr. B.] testified to ongoing depression, hallucinations, and agoraphobia
symptoms that affected his ability to interact with others and perform mental
activities."  AR 27.  "The claimant's mother also indicated that [Mr. B.] was

generally unable to perform activities of daily living secondary to his impairments." Id. (citing 7E).

The ALJ discounted Mr. B.'s subjective complaints by stating, "the claimant told providers that he retained the ability to shop online, color, read, and watch television."  AR 27 (citing 3E; 4F/38, 102).  [Mr. B.] also exhibited the ability to testify at his disability hearing via telephone.  AR 25.

At cite 3E/4, Mr. B. checked the box "By Mail" and "By Computer" in response to a question regarding shopping.  AR 265.  He then qualifies, stating, "I don't really shop, I have my mother shop for me.  I don't like shopping."  Id.  At cite 4F/38, counselor Smith stated that [Mr. B.] "copes through hope, trying, coloring, watching tv and reading he has a book on Bulimia."  AR 433.  At cite 4F/102, [Mr. B.] told LPC Smith that he watched war documentaries on tv and would like to read books on wars/history/political science.  AR 497.  The recommended activities for Mr. B. included art: perhaps some art/drawing/coloring, journaling, reading of books that he enjoys.  AR 498.

The evaluation of intensity, persistence, and limiting effects of the claimant's symptoms considers the ability to do *work-related* activities.  SSR 16-3p, 2017 WL 5180304 *4 (10/25/17) (emphasis added).  "The fact that you have done, or currently do, some routine activities without help or support does not necessarily mean that you do not have a mental disorder or that you are not disabled."  20 C.F.R. Pt. 404, Subp't P, App. 1, § 12.00(D)(3).  "A claimant need not prove she is bedridden or completely helpless to be found

disabled." <u>Reed</u>, 399 F.3d 917 at 923 (citing <u>Thomas v. Sullivan</u>, 876 F.2d 666, 669 (8th Cir.1989)).

> The claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." <u>Thomas</u>, 876 F.2d at 669 (citing <u>McCoy v. Schweiker</u>, 683 F.2d 1138, 1147 (8th Cir.1982) (en banc)). This admonition underscores that portion of SSR 85–16 which references the need to consider the frequency and independence of activities performed by the claimant, as well as the claimant's ability to sustain these activities over a period of time.

<u>Id.</u> at 923.

In <u>Reed</u>, daily activities such as doing crafts, fixing meals, watching movies, checking the mail, and doing laundry, were not inconsistent with the claimant's symptoms related to anxiety, panic attacks, difficulty sleeping, loss of concentration and discomfort around strangers. <u>Id.</u> The court explained, "although [a]cts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility, this court has repeatedly observed that the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work." <u>Id.</u> (citations omitted); <u>see</u> <u>also</u> <u>Banks v. Massanari</u>, 258 F.3d 820, 832 (8th Cir. 2001) ("How many times must we give instructions that [watching television, visiting friends, and going to church] do not indicate that a claimant is able to work full time in our competitive economy?").

Here as in <u>Reed</u>, Mr. B.'s very limited daily activities of coloring, watching television, and reading, provide little to no support of his ability to function in

the competitive economy to the extent the ALJ suggests.[7]  Mr. B.'s ability to testify via phone has little bearing on his ability to function in the competitive economy.  Several times Mr. B. cancelled appointments with his BMS team, refused to use Zoom, and refused to talk on the phone due to paranoid delusions.  Even more extensively than in <u>Reed</u>, Mr. B. performs no household chores and relies on his mother to cook, clean, and transport him.  Mr. B. does not socialize and has no hobbies.  Mr. B.'s daily activities support his symptoms; they do not contradict them.  The ALJ's discounting of Mr. B.'s symptoms are not supported by substantial evidence.

### iii.    Third Party Testimony

Lynette Roberts, Mr. B.'s case manager completed Mr. B.'s functional report for his social security application.  AR 270.  The ALJ discounted Mr. B.'s symptoms by referencing Ms. Robert's report, stating, "[Mr. B.] retained the ability to count change and use a checkbook and money order."  AR 273.  On the report, Ms. Roberts did check the "yes" box for "count change" and "use a checkbook/money orders", however, she checked "no" for "pay bills" and "handle a savings account".  <u>Id.</u>  She explained, "Pay bills – can't focus enough to do it, savings acct – cannot keep track of money."  <u>Id.</u>

Mr. B. told his counselors numerous times that notices for unpaid bills and collections calls made him angry.  On August 28, 2020, he reported to

---

[7] This court will discuss the ALJ's RFC findings under issue two, the ALJ determined that Mr. B. could work an eight-hour workday with five percent off task and absent one day a month with occasional interaction with co-workers and no interaction with the general public.  AR 25.

Ms. Roberts that the cops delivered an overdue bill from Fingerhut to his house, and he got really upset, but not violent.  AR 501.  Mr. B. testified that he relied on his mother for financial support and that he would be homeless without her.  AR 78.  The ALJ's use of Ms. Robert's report does not accurately represent Mr. B.'s ability to manage money.  The third-party report supports, rather than contradicts, Mr. B.'s symptoms and his statements that those symptoms affected his ability to perform work activities.  AR 26.

### iv.    Precipitating and Aggravating Factors

Impartial medical expert, Dr. Allison Podczerwinsky, opined that Mr. B.'s symptoms were not to the extent alleged in part because of his history with substance abuse.  AR 47.  The ALJ found this part of Dr. Podczerwinsky's administrative medical findings unpersuasive.  AR 47.  "The claimant described a history of substance abuse that began when he was 13 years old (2F/15).  However, the record did not provide any evidence of ongoing substance abuse."  AR 26, 103, 113, 357, 361, 389.  Mr. B. described his problems with alcohol as occurring in his early 20s.  AR364.  He was 30 years old at the time he applied for disability benefits, nearly 31 when the ALJ issued its unfavorable decision.  AR 189-214.  He stated he now rarely drank anymore.  AR364.

### v.    Dosage, Effectiveness and Side Effects of Medication

An ALJ must consider the treatment received by a claimant.  "With treatment, you may not only have your symptoms and signs reduced but may also be able to function in a work setting.  However, treatment may not resolve

all of the limitations that result from your mental disorder."  20 C.F.R. Pt. 404,

Subp't P, App. 1, § 12.00(D)(4).

The ALJ considered Mr. B.'s medications and treatments and discounted

Mr. B.'s subjective symptoms.  AR 27.

> The record shows the claimant was prescribed medication,
> including Zyprexa, Risperidone, and Trintellix, to treat his
> symptoms (2F/18, 32).  The claimant also underwent other
> treatment modalities, including therapy (2F/26).  Providers noted
> some improvement and stabilization of the claimant's symptoms
> with treatment.

Id.

Mr. B. last took medication for his mental illness at the age of 19.  AR

99.  He had not recently been medicated before becoming a patient at BMS on

March 27, 2020.  Id.  Mr. B.'s first mental status exam at BMS showed -

Mental status: mood was anxious; affect: constricted; speech: pressured;

thought process: tangential loose; hallucination: auditory command visual

tactile; thought content: paranoid; delusions: thought broadcasting; cognition:

impairment of attention/concentration ability to abstract, erratic/inconsistent

memory; intelligence estimate: average; insight: within normal limits;

judgment: impaired ability to make reasonable decisions: moderate.  AR 358.

As of December 2020, Mr. B. was still reporting auditory hallucinations.

AR 406.

On September 10, 2020, Mr. B. reported to Ms. Roberts that "he feels the

medication is starting to work as the symptoms are not as strong and

constant."  AR 494.  In the September 25, 2020, report cited by the ALJ, and

the October 23, 2020, report, Mr. B. denied any hallucinations, but still

reported anxiety, depression, and difficulty concentrating.  AR 536, 541.
Mr. B. reported "feeling better" but that the cops were called to his house
regarding his behavior.  AR 535.  CNP O'Connor noted that "his mood is
stabilizing with some anxiety/depression, energy/concentration and sleep are
improving and he denies many negative thoughts."  Id.  As of December 15,
2020, Mr. B. reported "less voices in his head. . . no shadow figures."  AR 406.
On December 17, 2020, Mr. B. reported that he was still struggling with
insomnia and anxiety, the kind where he sweats, gets tensed and paranoid,
and does not want to be around others.  AR 403.

The final mental status exam on record was from December 30, 2020.
AR 396.  Mr. B. was taking his medications as prescribed.  AR 398.  Mental
Status: Mood: Euthymic, Affect: Constricted, Speech: Underproductive,
Thought Process: Slowed Thinking, Hallucinations: Denied, Thought Content:
Preoccupations/ ruminations Obsessional Paranoid, Cognition: Impairment of:
Attention / concentration.  AR 399.

The hearing in front of the ALJ took place January 19, 2021, roughly two
weeks after Mr. B.'s last mental status examination on record.  AR 66.  In
response to the question whether he was getting any improvement through
counseling and/or his medication regime specific to hearing voices, Mr. B.
responded, "I think they're staying the same.  I've been trying different
medications, and that's what I'm trying to hope I was going to improve with the
medications."  AR 75.  Mr. B. responded that he felt the counseling was helpful.
"It really helps with the delusions."  AR 76.

The ALJ concluded, based on a comparison of Mr. B.'s testimony and the most recent mental status exams, that Mr. B.'s symptoms were not to the extent professed.  AR 27.  Mr. B. on mental status exam was intermittently reporting hallucinations and was telling his care team that he was improving with medication.

### vi.    Varied Symptoms & Remission

Plaintiff insists that the ALJ must consider the variable symptoms and periods of remission that accompany his mental illness.  Docket No. 22, p. 12.  The Eighth Circuit has noted, "[i]t is inherent in psychotic illnesses that periods of remission will occur.  This does not, however, lead to the conclusion that the disability has ceased, particularly given the overwhelming evidence to the contrary in this case."  Dreste v. Heckler, 741 F.2d 224, 226 n.2 (8th Cir. 1984).  The court also referenced this principle in Andler v. Chater, 100 F.3d 1389, 1393 (8th Cir.1996), however that case addressed periods of remission to calculate substantial gainful employment at step one, not to evaluate a claimant's symptoms.  In Hutsell v. Massanari, cited by plaintiff, there was evidence in the record that the claimant had suffered relapses and had been hospitalized at least three times for psychotic episodes that occurred unpredictably.  Hutsell v. Masanari, 259 F.3d 707, 712 (8th Cir. 2001).

This court finds that the ALJ did consider the whole record and acknowledged times where Mr. B.'s symptoms varied over the course of his treatment at BMS.  The ALJ never stated that Mr. B.'s symptoms were completely abated by treatment, merely improved for the period between

71

September 25, 2020 to December 30, 2020.  Mr. B. was never institutionalized, and a relapse of symptoms was not noted on the record.  Mr. B. did not submit additional medical records with his appeal.  AR 1-4.  But given the record as a whole, the ALJ's conclusion is not supported by substantial evidence.  While Mr. B.'s auditory hallucinations were intermittent for that period, he maintained high levels of anxiety, depression, paranoia, and issues with speech and cognition, symptoms that would inevitably impact his ability to perform work-related activities.

### vii.   Structured Settings

Consideration of structured setting and its effects on individuals is required by 20 C.F.R. Pt. 404, Subp't P, App. 1, § 12.00(D).  "We evaluate the effects of your mental disorder and rate the limitations of your areas of mental function, we will consider the kind and extent of supports you receive, the characteristics of any structured setting in which you spend your time."  Id. at (D)(1).  An ALJ should consider whether the claimant receives help from family members who monitor the claimant's daily function and help them function. Id. at (D)(a).  Examples include, administering medicine, reminders to eat, shopping, and paying bills for the claimant.  Id.  You receive assistance from a crisis response team, social workers, or community mental health workers who help you meet your physical needs, and who may also represent you in dealings with the government or community social services.  Id. at (D)(f). Structured settings may help a claimant by reducing the demands made on them.  Id.  "You may spend your time in a highly structured setting, however

this does not necessarily show how you would function in a work setting on a sustained basis, throughout a normal workday and workweek." Id. at (D)(3)(b).

The ALJ noted that Mr. B. reported significant symptoms resulting in limitations on activities of daily living. AR 27. Mr. B.'s mother aided him with most activities of daily living. AR 27, 288-294. Ms. Roberts corroborated this in her report. AR 272 (Ms. Roberts reported that Mr. B.'s mother reminds him to take medications, otherwise, he would forget, mom does the cooking, he stays and home and does not go anywhere.) LPC Smith stated, "[i]t takes an extremely flexible mental health team to help [Mr. B.]." AR 385. "He depends on his mother to care for him. Without help at this time he could end up in patient or institutionalized." Id.

The ALJ seemingly rejected the effects of Mr. B.'s structured environment on his symptoms citing normal mental status exams, and the ability to shop, color, read, and watch television. AR 45. By not citing accurate evidence in the record to support its conclusions on Mr. B.'s mental status, failing to consider additional daily activities relevant to work-related ability, and failing to account for the highly structured environment that allows Mr. B. the level of functioning he is currently able to attain, the ALJ's discounting of Mr. B.'s symptoms was not supported by substantial evidence. In addition, while the ALJ does not have to discuss all the Polaski factors, Mr. B.'s work history is a notable omission from the ALJ's analysis. Mr. B. discussed his previous work as a paraprofessional and his reasons for leaving that employment in his testimony. AR 73. The ALJ does not discuss these facts at all.

73

## 2.   The ALJ erred in failing to find that plaintiff met or equaled listing §§ 12:03, 12:13 and 12:06.

To qualify for disability at step three, a claimant must establish that their impairment meets or equals a listing.  Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004).  The Eighth Circuit has found that:

> An impairment meets a listing only if it "meet[s] all of the specified medical criteria."  Sullivan v. Zebley, 493 U.S. 521, 530, (1990).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  Id.  To prove that an impairment or combination of impairments equals a listing, a claimant "must present medical findings equal in severity to all the criteria for the one most similar listed impairment."  Id. at 531.

KKC ex rel. Stoner v. Colvin, 818 F.3d 364, 370 (8th Cir. 2016).

For Mr. B. to be considered disabled for schizophrenia and/or an anxiety disorder at step three, he must demonstrate that he meets either paragraph B criteria or paragraph C criteria.  See 20 C.F.R. pt. 404, subpt. P, App. 1 (pt. A2) § 12:00.G.1 (2021), Listings ("Listings") §§ 12.03, 12.06.  For Mr. B. to be considered disabled for an eating disorder, he must demonstrate that he meets both paragraph A and B criteria.  Listing § 12.13, see 12.00.B.10.  The ALJ did not address paragraph A criteria in the opinion.  AR 24.  The ALJ concluded that Mr. B. did not meet either the paragraph B or paragraph C criteria so did not meet or equal a listing.[8]  AR 24-25.  Mr. B. takes issue with the ALJ's analysis under paragraph B.

---

[8] Mr. B. applied for disability under §§ 12.03, 12.04, 12.06, and 12.13 but raises §§ 12.03, 12.06, and 12.13 on appeal.  AR 24; Docket No. 22, pp. 22-28. The plaintiff did not raise a paragraph C issue, so this court declines to address the ALJ's paragraph C analysis.

74

As to the paragraph B criteria, Mr. B. asserts the ALJ erred by not finding he had at least one extreme or two marked limitations in a broad area of functioning.  Docket No. 22, pp. 22-28.  In order to meet the paragraph B criteria, Mr. B. must have demonstrated that his mental impairments resulted in at least one extreme or two marked limitations in one of the following broad areas of functions:

- understanding, remembering, or applying information;

- interacting with others;

- concentrating, persisting, or maintaining pace; or

- adapting or managing themselves.

Listing §§ 12.03.B.1-4, 12.06B.1-4, 12.13B.1-4.  Unlike step two, the determination at step three is made by considering all the evidence, not just medical evidence.  Listing § 12.00.C.6.c.

The ALJ found only mild and moderate limitations in the paragraph B criteria.  AR 24-25.  Specifically, the ALJ found Mr. B. had "mild" limitations in understanding, remembering, or applying information.  Id.  The ALJ found he had "moderate" limitations in interacting with others, adapting or managing himself, and concentrating, persisting or maintaining pace.  Id.

An "extreme" limitation is "the inability to function independently, appropriately or effectively, and on a sustained basis."  Listing § 12.00.F.2.e. A "marked" limitation means that one's ability to "function independently, appropriately, effectively, and on a sustained basis is seriously limited."  Listing § 12.00.F.2.d.  A "moderate" limitation means the claimant has a "fair" ability

to function in the area independently, effectively and on a sustained basis. Listing § 12.00.F.2.c.  A "mild" limitation means the claimant is only "slightly limited" in their ability to function independently, effectively and on a sustained basis in the area.  Id. at § 12.00.F.2.b.

Relying primarily on Shanua Smith, LPC's report, Mr. B. asserts the evidence shows he was extremely or markedly limited, not mildly or moderately limited.  AR 385-386.

The ALJ discussed the following areas of functioning and then discussed the evidence which supported the ALJ's conclusion that Mr. B. was either mildly or moderately limited in that area:

> **Understanding, remembering or applying information**—the ALJ found Mr. B. had mild limitation because "the claimant stated that he could shop by mail or online, color, watch television, and read (3E; 4F/38, 102)".  Additionally, the ALJ noted "average estimated intelligence, logical thought processes, and normal judgment and insight" without citation to the record.  AR 24.

> **Interacting with others**—the ALJ found Mr. B. had moderate limitation.  Id.  "[T]he claimant stated that his impairments affected his ability to get along with others and interact with authority figures (3E).  Mental status examination findings below showed occasions where the claimant exhibited an anxious mood, constricted affect, self-deprecation, paranoia, a dark demeanor, and reactive behaviors to hallucinations.  However, as mentioned below, examining providers also found the claimant was calm and exhibited normal psychomotor activity, clear speech, normal perception, and the ability to communicate in a calm manner."  Id.

> **Concentrating, persisting or maintaining pace**—the ALJ found Mr. B. had a "moderate" limitation in this area and cited the same reasoning as above, "claimant stated he could shop by mail or online, color, watch television, and read," and "claimant was calm and exhibited normal psychomotor activity, clear speech, normal perception, and the ability to communicate in a calm manner."  Id. at 24-25.

76

**<u>Adapting or managing oneself</u>**— the ALJ found Mr. B. had a "moderate" limitation in this area and cited the same reasoning as above, "he stated he could shop online (3E)" and "examining providers found the claimant was well groomed, calm, and exhibited normal judgment and insight, logical thought processes, normal perception, and the ability to communicate in a calm manner." <u>Id.</u> at 25.

Shauna Smith, LNP, assessed Mr. B.'s functional ability as

- Marked - understanding, remembering, or applying information;

- Marked - interacting with others;

- Marked - concentrating, persisting, or maintaining pace; or

- Marked/Extreme - adapting or managing themselves.

AR 385-386.

[Mr. B.'s] voices tell him to kill himself so Mr. B. purges to the point that he passes out to feel a near death experience to appease the voices. . . . He is very paranoid and would not – could not handle nor adapt to changes. . . . It takes an extremely flexible mental health team to help [Mr. B.]. Paranoid and misses appointments. . . . He depends on his mother to care for him. Without help at this time he could end up in patient or institutionalized.

<u>Id.</u>

In response to whether Mr. B. is able to accept instructions and respond appropriately to criticism from supervisors, LPC Smith marked, "No", explaining, "[h]e would have an angry or dangerous counter reaction as he has before."  AR 386.  When asked whether Mr. B. was able to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, LPC Smith marked, "No", explaining "He wears his pjs all day long – he needs his mom to prompt his hygiene."  <u>Id.</u>  LPC Smith also believed that Mr. B. would miss over four days of work a month, his symptoms would

interfere with his concentration more than 25% of the day, and he would require more than 45 minutes of unscheduled break time in an 8-hr workday. Id.  The ALJ found LPC Smith's opinion unpersuasive by citing the "normal mental status examinations," which were previously addressed and contradicted by the record in this opinion, and Mr. B.'s ability to shop online, color, read, and watch television.  AR 29.

Plaintiff cites additional evidence for Listing § 12.03 beyond LPC Smith's assessment as to "marked" limitations including Mr. B.'s inability to manage his hygiene, to live alone, mental status exams throughout showing impaired judgment, slowed thinking process, and hallucinations.  Docket No. 22, p. 25; AR 386, 433, 447, 458; 3F/2.  Evidence for § 12.13 offered, "[Mr. B.] hears voices telling him to kill himself so he purges to the point that he passes out to feel a near death experience to appease the voices."  3F/1; AR 385.  Evidence of "marked" limitation for Listing § 12.06 presented by Mr. B. referenced the same.  Docket No. 22, p. 28.  The government in brief responded, "The ALJ properly considered the Plaintiff's self-reported functional abilities, which included his ability to shop online, color, read, and watch television."  Docket No. 24, p. 13.  Plaintiff also played video games and had "normal mental status examination results."  Id.

Without more, this court cannot conclude that the ALJ's assessment of Mr. B.'s paragraph B criteria is supported by substantial evidence for similar reasons previously discussed under issue one.  Mr. B. did not have "normal mental status exams" and the daily activities of coloring, reading, and watching

television are not appropriate indicators of limitations for paragraph B analysis.
Because the ALJ improperly considered and discussed evidence relative to
crediting Mr. B.'s reports of his symptoms, and because Mr. B.'s self-reported
symptoms and limitations are to be considered along with medical evidence at
step three (see Listing § 12.00.C.6.c), this court believes re-evaluation of step
three is necessary once the Polaski factors are properly analyzed.

### 3.     Whether the ALJ's residual functional capacity finding is supported by substantial evidence.

Plaintiff alleges that at step four, the RFC formulated by the ALJ is not
supported by substantial evidence.  Docket No. 22, p. 18.  Plaintiff relies on
similar arguments made under the first issue as to credibility, in addition to
the ALJ improperly rejecting medical opinions on record.  Id. at p. 19.  The
government responds, "[t]he ALJ accounted for Plaintiff's mental limitations,"
justified by, "normal mental status examination results and symptom
improvement with medication and counseling."  Docket No. 24, pp. 7-8.

Residual functional capacity ("RFC") is "defined as what the claimant can
still do despite his or her physical or mental limitations."  Lauer v. Apfel, 245
F.3d 700, 703 (8th Cir. 2001) (citations omitted, punctuation altered).   "The
RFC assessment is an indication of what the claimant can do on a 'regular and
continuing basis' given the claimant's disability."  Cooks v. Colvin, CIV. 12-
4177-KES, 2013 WL 5728547, at *6 (D.S.D. Oct. 22, 2013) (quoting 20 C.F.R.
§ 404.1545(b)).  The formulation of the RFC has been described as "probably
the most important issue" in a Social Security case.  McCoy v. Schweiker, 683

F.2d 1138, 1147 (8th Cir. 1982), abrogation on other grounds recognized in Higgins v. Apfel, 222 F.3d 504 (8th Cir. 2000).

When determining the RFC, the ALJ must consider all of a claimant's mental and physical impairments in combination, including those impairments that are severe and those that are nonsevere.  Lauer, 245 F.3d at 703; SSR 96-8p, 1996 WL 374184 (7/2/96).  Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all the relevant evidence . . . a claimant's residual functional capacity is a medical question."   Lauer, 245 F.3d at 703 (citations omitted).  Therefore, "[s]ome medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace." Id.  (citations omitted).  "The RFC assessment must always consider and address medical source opinions." SSR 96-8p, 1996 WL 374184 (7/2/96).  If the ALJ's assessment of RFC conflicts with the opinion of a medical source, the ALJ "must explain why the [medical source] opinion was not adopted."  Id.

For cases filed after March 2017, like this one, medical opinions from accepted medical sources about the nature and severity of an individual's impairment(s) are evaluated according to how supported the opinion is by objective medical evidence and supporting explanations, and how consistent the opinion is with other medical and nonmedical evidence in the record.  20 C.F.R. § 404.1520c(c)(1) - (2).  Other considerations are the relationship the medical source had with the claimant, the length of their treatment

relationship, the frequency of examinations, the purpose of the treatment relationship, the kinds and extent of testing or examinations, and whether the medical opinion is in an area in which the medical source has expertise or specialization.  20 C.F.R. § 404.1520c(c)(3) – (5).

Acceptable medical sources include licensed physicians and psychologists.  20 C.F.R. § 416.902(a)(1) & (2).  It also includes licensed advanced practice registered nurses and physician assistants for issues within the scope of their licensed practice.  20 C.F.R. § 416.902(a)(7) & (8).  Only an accepted medical source can diagnose or establish the existence of a medically determinable impairment through objective medical evidence.  20 C.F.R. § 404.1521.  But RFC is determined by considering all relevant evidence, including statements from "medical sources" who are not "acceptable."  20 C.F.R. § 404.1545(a)(3); 20 C.F.R. § 404.1513(a)(2).

Ultimate issues such as RFC, "disabled," or "unable to work" are issues reserved to the ALJ.  SSR 96-8p, 1996 WL 374184 *7 (7/2/96).  Medical source opinions on these ultimate issues must still be considered by the ALJ in making these determinations.  Id.  However, the ALJ is not required to give such opinions special significance because they were rendered by a treating medical source.   20 C.F.R. § 404.1520c.  When writing its opinion, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence . . . In assessing RFC, the adjudicator must . . . explain how any material

inconsistencies or ambiguities in the evidence in the case record were considered and resolved."  SSR 96-8p, 1996 WL 374184 (7/2/96).

Finally, "to find that a claimant has the [RFC] to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Reed, 399 F.3d at 923 (citations omitted, punctuation altered); SSR 96-8p, 1996 WL 374184 *1 (7/2/96) ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule.").  The ultimate question is whether "substantial evidence [i]n the record as a whole" supports the ALJ's RFC formulation.  Pelkey v. Barnhart, 433 F.3d 575, 577 (8th Cir. 2006).

### a.    The ALJ Decision

The ALJ found Mr. B. capable of performing a full range of work at all exertional levels with the following limitations:

> He is able to perform simple, routine and repetitive tasks; occasionally interact and respond appropriately with supervisors; and occasionally interact with co-workers no for tasks requiring teamwork.  He cannot interact with the general public.  He is able to make simple, work-related decisions.  He will be off task for five percent of an eight-hour workday and was absent from work for one day a month.

AR25.

The ALJ began with the state agency's assessment of Mr. B.'s mental RFC at the initial consideration phase.  AR 27, 95-103.  The state agency

determined that Mr. B. had mild limitations in understanding, remembering, or applying information and moderate limitations in the remaining paragraph B criteria.  The ALJ did find the state agency assessments on the paragraph B criteria were generally consistent with the record.  AR 28.

The state agency reported that Mr. B. could carry out, sustain attention and concentration, persist and maintain pace for detailed tasks with concrete variables that require three-to-six months of training; maintain a normal workday/workweek on a sufficient basis.  Id.  The ALJ determined these findings were inconsistent with the record evidence.  Id.  The ALJ opined that record evidence supported a more restrictive RFC because:

> The claimant exhibited an anxious mood, constricted affect, paranoid thought content, auditory and visual hallucinations, impaired judgment, slowed and tangential processes, impaired attention and concentration, ruminating and pre-occupied thought content, paranoia, a dark demeanor, and reactive behaviors to hallucinations, as well as the claimant's history of treatment with medication and therapy.[9]

AR 28.

The ALJ then considered the state agency assessment at the reconsideration phase.  AR 28, 104-113.  The paragraph B assessment mirrored the initial phase mental RFC.  Id.  The consultants opined that Mr. B. could persist at tasks that could be learned in one-to-three months, work in coordination with or proximity to others without being unduly distracted or exhibiting behavior extremes and interact minimally with the public.  Id.  The

---

[9] Mental status exams were conducted by medical source, Peggy O'Connor, CNP.  20 C.F.R. § 416.902(a)(7).

ALJ acknowledged that this functional capacity conclusion was not only inconsistent with the record evidence but was internally inconsistent.  Id. Despite the ALJ once again noting Mr. B.'s array of mental illness symptoms, it concluded that the Mr. B.'s paragraph B findings by the state agency were consistent with the record.  Id.

Impartial medical expert, Dr. Allison Podczerwinsky, opined that Mr. B.'s paragraph B criteria was mild in all areas. AR 28.  She concluded that Mr. B. retained the ability to complete simple-to-moderate tasks, decision making, and interactions with others.  Id.  The ALJ found that these findings were inconsistent with the record, evidenced again by citing Mr. B.'s symptoms. AR 29.

LPC Smith opined that Mr. B.'s symptoms would be severe enough to interfere with his attention and concentration more than 25% of the day and that he would miss more than four days of work per month due to medical conditions, symptoms, side effects, appointments, or decompensation in a work setting.  AR 386.  He would also need at least 45 minutes of unscheduled break time during an eight-hour workday.  Id.  The ALJ found this assessment, and LPC Smith's mental RFC assessment of marked limitations under paragraph B unpersuasive due to Mr. B.'s "normal mental status"[10] and his ability to online shop, color, read, and watch TV.  Id.  The ALJ did not cite Mr. B.'s symptoms

_____

[10] The ALJ's use of "normal mental status" as referenced by the government in brief is problematic throughout the ALJ's opinion.  As discussed under issue one, the ALJ referenced the record and those record cites presented information to the contrary of what the ALJ represented.

when rejecting LPC Smith's assessment as it did when accepting the state agency and Dr. Podczerwinksy's paragraph B assessments.  Id.

### b.   Analysis of the Record Evidence

The government argues that LCP Smith's opinions were appropriately discounted by the ALJ as she is not an acceptable medical source.  Docket No. 24, p. 9.  The government is correct that under 20 C.F.R. § 416.902(a), a licensed counselor is not a medical source.  However, medical sources are just one consideration when assessing a claimant's RFC.  SSR 96-8p, 1996 WL 374184 (7/2/96).  While plaintiff contends that LCP Smith's RFC assessment was formed in consultation with CNP O'Connor, this court cannot conclude that it was CNP O'Connor who determined Mr. B.'s "marked" limitations. Docket No. 27, p. 11.  Ultimately, whether LPC Smith is a "medical source" or a "nonmedical source," or relied on a "medical source" for her report is not dispositive for Mr. B.'s RFC analysis since the RFC formulation requires the consideration of all relevant evidence.  The ALJ did consider LPC Smith's opinion in formulating plaintiff's RFC.  Therefore, the court moves on to the second consideration:  whether the ALJ gave the proper weight to that opinion.

Under the new treating physician rule, the ALJ is instructed to explain how he or she considered the factors of supportability and consistency, the two most important factors in determining the persuasiveness of a medical opinion or a prior administrative medical finding.  20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(1).  Other factors include relationship with the claimant, length of the treatment relationship, frequency of examinations, purpose of treatment

relationship, and extent of the treatment relationship.  20 C.F.R.

§§ 404.1520c(c)(3)(i) – (v).  An ALJ may reject or discount all or part of an

opinion if it is unsupported by medical findings, inconsistent with other

substantial evidence in the record, or inconsistent with the physician's own

findings.  See Pearsall, 274 F.3d at 1219; Prosch v. Apfel, 201 F.3d 1010, 1013

(8th Cir. 2000).

Mr. B.'s mental status examinations that support LPC's Mr. B.'s

"marked" limitations were conducted by Peggy O'Connor, a CNP, who is an

acceptable medical source.  20 C.F.R. § 416.902(a)(7).  CNP O'Connor had been

treating Mr. B. since March of 2020 through when the ALJ issued its opinion.

When evaluating Mr. B.'s mental RFC the ALJ cited to one medical source, CNP

O'Connor's mental status examinations.  The ALJ used Mr. B.'s reported

symptoms from these examinations for evidence of additional RFC limitations

above the state agency recommendations, yet disregarded these same

symptoms when discounting LCP Smith's RFC.  Although Mr. B. was improving

with treatment and counseling, as evidenced by his mental status

examinations for the period of August – December of 2020, symptoms justifying

limitations were consistent and supported by CNP O'Connor.  Auditory

hallucinations and negative thoughts were not reported by CNP O'Connor for

this time period.  AR 396-397.  However, LPC Smith reported Mr. B. having

auditory hallucinations on October 27, 2020.  AR 454.

The government argues it is significant that "plaintiff's alleged major

impairment is schizophrenia," and that "he reported his schizophrenia seemed

more balanced during periods of medication compliance."  Docket No. 24, p. 12.  While schizophrenia and its associated symptoms of hallucinations are significant considerations for RFC limitations, so are limitations associated with Mr. B.'s other severe impairments – depression; anxiety; and bulimia nervosa.  AR 24.  As of December 30, 2020, the final mental status exam on record, Mr. B was exhibiting depression/anxiety, constricted affect, underproductive speech, slowed thinking process, preoccupations / ruminations obsessional paranoid, impairment of attention / concentration.  Id.  CNP O'Connor also noted, Mr. B. had "minimal progress."  AR 399.  Given the record evidence, this court cannot agree with the ALJ that Mr. B. had "normal mental status" for purposes of accepting the state agency RFCs and discounting LPC Smith's RFC.

The government argues that LPC Smith's RFC is contradicted by her own treatment notes.  Docket No. 24, p. 11.  The government states, "[c]ounselor Smith noted Plaintiff was no longer seeing dark shadow figures, he heard voices less frequently since his medication increase, medication improved his symptoms of paranoia, he experienced less depression and more energy, he exhibited no disorganized thinking, he engaged in positive, meaningful activities, and he denied delusions and hallucinations (JSMF 22, 28, 31, 32, 35, 37, 41, 43, 46, 48, 50, 53, 54, 55; AR 410, 417, 423, 433, 439, 447, 454, 458, 472, 478, 485, 488, 497, 513-514)."

In these same reports, Mr. B. reported still hearing voices, anxiety and nervousness (AR 412); depression and not doing anything on his own unless he

has company so he feels safe (AR 416); anxiety and cannot get out of bed, and struggling with hygiene (AR 419).  LPC Smith assessed that Mr. B. cannot live alone and is dependent on his mother for care (AR 433).  Mr. B.'s pjs were covered in dog hair, his affect was flat, and he stared straight ahead (AR 440); Mr. B. had not showered in a while and wore the same shirt and pjs from previous visits (AR 447); voices are constant, he only can sleep three hours a night, bulimia is very bad, changes clothes once per month (AR 458); Mr. B. refuses to come to the office, use zoom (AR 472); Mr. B. would not leave the house and was hearing voices (AR 478); Mr. B. is paranoid, will not use Zoom, will not talk on the phone, does not form bonds with others (AR 485); Mr. B. is binging and purging weekly (AR 488); Mr. B. had intermittent eye contact but was more on than off, was having auditory and visual hallucinations at night (AR 497); Mr. B. was triggered by loud noises like the air conditioner and television, was binging and purging (AR 513-514).

On October 27, 2020, LPC Smith reported that Mr. B. was intense and mean, and was hearing voices.  AR 454.  "[Mr. B.] was not the usual person that comes into the office with a kind and gentle demeanor. . . . He appeared to be communicating with his voices and reacting with facial gestures and head movements.  [Mr. B.] was in a very negative mood today."  Id.  LPC Smith's RFC report is dated October 27, 2020, so her assessment of marked limitations was consistent with Mr. B.'s symptoms she observed that same day.

LPC Smith's assessment of Mr. B.'s inability to work an eight-hour workday with less than one absence a month was consist with the VE's opinion

88

based on Mr. B.'s symptoms.  AR 88-89.  At the hearing, the ALJ asked the VE, "focusing on the mental health issues that we've heard testimony here today, if the inability due to the various mental health symptoms of the individual is suffering, if the inability to maintain work without excessive absenteeism, and by that I mean two or three days per month each and every month the individual would simply isolate, and would not report for his job . . . could these jobs be performed?"  Id.  The VE responded, "No, they could not."  Id.  When asked if there were any jobs that could be performed at the higher rate of absenteeism, the VE responded, "No."  Id.  Asked if the hypothetical individual was off task over 10% of the time, could the jobs be maintained, the VE answered, "No, that would not allow for someone to sustain competitive employment with that level of time off task."  Id.

The ALJ conceded that Mr. B.'s mental illness symptoms justified additional limitations on the RFC and that Mr. B.'s improvement and stabilization was not universal for all his impairments.  AR 27-28.  While true that the ALJ does not have to give additional weight to the RFC opinions of LPC Smith, the ALJ must explain why such opinions are inconsistent with the record evidence.  SSR 96-8p, 1996 WL 374184 (7/2/96).  The "normal mental status" relied upon by the ALJ for discounting LPC Smith's marked limitations and work absenteeism assessment is contrary to the record and lacks sufficient explanation by the ALJ.  LPC Smith's opinions must also be given equal consideration in formulating the RFC.  20 C.F.R. § 404.1545(a)(3); 20 C.F.R. § 404.1513(a)(2).  After review of the whole record, and citations relied upon by

89

the ALJ, this court finds that the ALJ's RFC is not supported by substantial evidence.

## E.      Type of Remand

Mr. B. requests reversal of the Commissioner's decision with remand for further development.  See Docket No. 18, p. 21.  For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record as to Mr. B.'s credibility, whether he meets or medically equals a listing at step three, and what RFC he is capable of at step four.

Section 1383(c)(3) of Title 42 of the United States Code provides that final decisions made by the Commissioner of the Social Security Administration as to Title XVI benefits shall be subject to judicial review under 42 U.S.C. § 405(g). "Section 405(g) of Title 42, United States Code, authorizes judicial review of 'any final decision of the Commissioner . . . made after a hearing.' " Efinchuk v. Astrue, 480 F.3d 846, 848 (8th Cir. 2007) (quoting Mason v. Barnhart, 406 F.3d 962, 964 (8th Cir. 2005)).  It "authorizes only two types of remand orders: (1) those made pursuant to sentence four, and (2) those made pursuant to sentence six." Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000) (citing Melkonyan v. Sullivan, 501 U.S. 89, 98-99 (1991)).  A sentence four remand "authorizes a court to enter 'a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing.' " Id. (quoting 42 U.S.C. § 405(g)).

"A sentence four remand is therefore proper whenever the district court makes a substantive ruling regarding the correctness of a decision of the

Commissioner and remands the case in accordance with such a ruling." <u>Id.</u>  A sentence six remand is authorized "in only two limited situations: (1) where the Commissioner requests a remand before answering the complaint . . . or (2) where the new and material evidence is adduced that was for good cause not presented during the administrative proceedings." <u>Id.</u>  Neither sentence six situation applies here.

A sentence four remand is applicable in this case.  Remand with instructions to award benefits is appropriate "only if the record 'overwhelmingly supports' such a finding." <u>Id.</u> at 1011 (quoting <u>Thompson v. Sullivan</u>, 957 F.2d 611, 614 (8th Cir. 1992)).  "[W]hen a claimant appeals from the Commissioner's denial of benefits and we find that such a denial was improper, we, out of 'our abundant deference to the ALJ,' remand the case for further administrative proceedings." <u>Id.</u> (quoting <u>Cox v. Apfel</u>, 160 F.3d 1203, 1210 (8th Cir. 1998)).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be supplemented, clarified, and/or properly evaluated under the applicable law.  <u>See also</u> <u>Briscoe ex rel. Taylor v. Barnhart</u>, 425 F.3d 345, 356 (7th Cir. 2005) ("an award of benefits is appropriate only if all factual issues have been resolved and the record supports a finding of disability").  Therefore, a remand for further administrative proceedings so the ALJ can address these issues is appropriate.

**CONCLUSION**

Based on the foregoing law, administrative record, and analysis, it is

hereby:

ORDERED that Mr. B.'s motion to reverse and remand [Docket

No. 22] is granted and the Commissioner's motion to affirm [Docket No.

23] is denied.

DATED this 19th day of December, 2022.

BY THE COURT:

_____
VERONICA L. DUFFY
United States Magistrate Judge